561 So.2d 278 (1990)
STATE of Florida, Appellant,
v.
Tom Franklin SAWYER, Appellee.
No. 88-02307.
District Court of Appeal of Florida, Second District.
January 5, 1990.
*280 Robert A. Butterworth, Atty. Gen., Tallahassee, and Carol M. Dittmar, Asst. Atty. Gen., Tampa, for appellant.
Sondra Goldenfarb and Joseph G. Donahey, Jr., Clearwater, for appellee.
RYDER, Acting Chief Judge.
The State of Florida challenges two trial court orders which granted appellee Tom Sawyer's motion to suppress his interrogation and granted his motion in limine to exclude hair evidence in a capital first degree murder case. The state obtained a confession from Sawyer after several cadres of city of Clearwater Police Department detectives had continuously interrogated Sawyer over a period of approximately sixteen hours regarding the murder of Janet Staschak. The trial court orders were rendered after a six-week hearing on the motion to suppress during which forty-seven witnesses testified.
The state urges this court to reverse the trial court orders. One order suppressed substantial portions of the police's interrogation on the ground that Sawyer's statements, admissions, and confession were obtained involuntarily and in violation of Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966). The other order granted Sawyer's motion in limine to exclude hair evidence because the evidence was not probative of his guilt.
As appellee Sawyer correctly argues, the order granting his motion in limine is amenable to review by this court only by a petition for common law certiorari, not appeal. State v. Pettis, 520 So.2d 250, 252-53 (Fla. 1988); State v. Wilson, 483 So.2d 23, 24-25 (Fla. 2d DCA 1985). Accordingly, we treat the state's challenge on this issue as a petition for writ of certiorari. In reviewing the trial court's ruling which prohibits admission of a hair sample, we do not find that it departs from the essential requirements of the law. Therefore, we deny the state's petition for writ of certiorari.
In considering the admissibility of Sawyer's admissions and confession, the trial court not only had before it numerous witnesses who testified to the circumstances under which the confession was obtained, but the court also reviewed tape recordings of the actual sixteen-hour interrogation session. We wish to commend the Clearwater Police Department in its practice of maintaining a record of interrogations through the use of tape recording and express hope that this policy will continue. We also recommend this practice to all other law enforcement agencies so that challenges to future confessions can be exposed to the light of truth.
In this case, after hearing six weeks of testimony from forty-seven witnesses and listening to approximately sixteen hours of tape recordings of the actual interrogation, *281 the trial judge rendered a lengthy opinion to support his reasoning that the state did not carry its burden of proving by a preponderance of the evidence that appellant's confession was voluntary. In accompaniment to his order, the trial judge issued a twenty-five page opinion and a seventy-seven page summary of evidence which contains detailed factual findings. In his carefully drafted opinion, the trial judge set forth the operative facts and legal analysis upon which he based his decision. The trial court suppressed substantial portions of the interrogation because it found the statements and confession were a product of psychological coercion by the police and were, therefore, involuntary. The trial court also found the police had illegally failed to honor Sawyer's two requests for an attorney and failed to end the interrogation when Sawyer asserted his right to terminate the questioning. After reviewing his thoughtful and detailed analysis of these issues, we affirm the order granting the motion to suppress the results of the interrogation.
We begin our analysis by noting that for purposes of appellate review, the trial court's ruling concerning the voluntariness of Sawyer's confession is clothed with a presumption of correctness. DeConingh v. State, 433 So.2d 501, 504 (Fla. 1983), cert. denied, 465 U.S. 1005, 104 S.Ct. 995, 79 L.Ed.2d 228 (1984); Stone v. State, 378 So.2d 765, 769 (Fla. 1979), cert. denied 449 U.S. 986, 101 S.Ct. 407, 66 L.Ed.2d 250 (1980). The burden is upon the state to prove by a preponderance of the evidence that the confession was freely and voluntary given. Thompson v. State, 548 So.2d 198, 204 (Fla. 1989); DeConingh, 433 So.2d at 503; Roman v. State, 475 So.2d 1228, 1232 (Fla. 1985); cert. denied, 475 U.S. 1090, 106 S.Ct. 1480, 89 L.Ed.2d 734 (1986). The trial court's ruling on this issue cannot be reversed unless it is clearly erroneous. Furthermore, the Florida Supreme Court has suggested that the clearly erroneous standard applies with "full force" where the determination turns upon live testimony as opposed to transcripts, depositions or other documents. See Thompson, 548 So.2d at 204 n. 5.
In order to find that a confession is involuntary within the meaning of the Fourteenth Amendment, there must first be a finding that there was coercive police conduct. Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 93 L.Ed.2d 473 (1986). Police coercion can be not only physical, but psychological. Rickard v. State, 508 So.2d 736, 737 (Fla. 2d DCA 1987). The test of determining whether there was police coercion is determined by reviewing the totality of the circumstances under which the confession was obtained. Thompson, 548 So.2d at 203-04; Roman, 475 So.2d at 1232.
As part of the totality of the circumstances analysis, many factors have been considered by the courts, including: whether the confession was given in the coercive atmosphere of a station-house setting, Drake v. State, 441 So.2d 1079, 1081 (Fla. 1983), cert. denied, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984), Spradley v. State, 442 So.2d 1039, 1043 (Fla. 2d DCA 1983); whether the police suggested the details of the crime to the suspect, Langton v. State, 448 So.2d 534, 535 (Fla. 2d DCA 1984), Williams v. State, 441 So.2d 653, 655 (Fla. 3d DCA 1983), review denied, 450 So.2d 489 (Fla. 1984); whether the suspect was subjected to a barrage of questions during predawn hours and not given an opportunity to sleep or eat, Spradley, 442 So.2d at 1043; whether psychological coercion was applied, DeConingh, 433 So.2d at 503, Martinez v. State, 545 So.2d 466, 467 (Fla. 4th DCA 1989); whether the police made threats, promises of leniency, or made statements calculated to delude the suspect as to his or her true position, Brewer v. State, 386 So.2d 232, 237 (Fla. 1980), Williams, 441 So.2d at 655; whether the police made threats of harm, Williams, 441 So.2d at 656; and whether the police exerted undue influence or made direct or implied promises of benefits, Rickard, 508 So.2d at 737. Although particular statements or actions considered on an individual basis might not vitiate a confession, when two or more statements or courses of conduct are employed against a suspect, courts have more readily found the confession *282 to be involuntary. Williams, 441 So.2d at 656. Furthermore, an accused's emotional condition is an important factor in determining whether statements were voluntarily made. Rickard, 508 So.2d at 737.
In this case, all of the above factors were present. The record contains overwhelming, substantial evidence that Sawyer's confession resulted from psychological police coercion, as is thoroughly documented in the trial judge's opinion.
The state also argues that the trial judge erroneously ruled there were several Miranda violations throughout the interrogation. The police gave Sawyer Miranda warnings approximately four hours into the interrogation. Thereafter, they ignored two requests for counsel and refused to stop the questioning when Sawyer insisted he no longer wanted to talk and said he needed to sleep. The state admits that Sawyer made one equivocal request for an attorney which the police had an obligation to clarify under Long v. State, 517 So.2d 664 (Fla. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988). Where there is an equivocal request for an attorney, the police must cease all questioning until the meaning of the request or statement is clarified and if the police fail in this requirement, all portions of the confession occurring after the request must be suppressed. Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981); Miranda, 384 U.S. at 436, 86 S.Ct. at 1602, 16 L.Ed.2d at 694; Thompson, 548 So.2d at 203. After his first equivocal request for an attorney, Sawyer once again made another unequivocal request for an attorney which the police simply ignored. The record is clear that both times when the interrogation continued the police made no attempt to clarify Sawyer's requests for counsel, which was the only further inquiry the police were constitutionally permitted to make at that time. Thompson, 548 So.2d at 203; Long, 517 So.2d at 667. Accordingly, the trial judge correctly ruled that suppression of all portions of the interrogation after Sawyer's requests for counsel must be suppressed.
Additionally, the police failed to scrupulously honor Sawyer's request to cut off questioning in violation of Miranda, Spradley, 442 So.2d at 1043, and made persistent and repeated efforts to wear down his resistance and make him change his mind. See Michigan v. Mosley, 423 U.S. 96, 105-06, 96 S.Ct. 321, 327, 46 L.Ed.2d 313, 322 (1975). The trial court properly ruled that the interrogation should be suppressed on this ground after Sawyer's request for counsel.
We now set forth an abbreviated synopsis of the factual surroundings which led the police to consider Sawyer to be their prime suspect and culminated in the state's procurement of his confession, and also to provide the factual background on which the motion in limine was based.

Synopsis of Facts
Janet Staschak was discovered beaten, tortured and murdered in her bed in her apartment at approximately 9:00 a.m. on Monday, November 3, 1986. Her car was later discovered at Tampa Airport. Sawyer was Janet's next door neighbor.
The manager of the apartments where Janet lived called the police because she had not been seen for several days and people were worried. The first police officer at the scene discovered her kitchen window partially opened with a portion of it's screen cut out. Janet and Sawyer's apartments shared a cement slab for their adjacent kitchen back doors. Because the door to her apartment was locked, the officer asked a maintenance man to climb through the kitchen window and open the back door. He did so in his stocking feet. After the discovery of Janet's body, at least sixteen police officers and technicians with their equipment entered and worked in the apartment to investigate and collect evidence. Several unknown hair samples were found on or around Janet's body in her upstairs bedroom, and one unknown hair was found beneath the kitchen window. That kitchen window hair was collected on 8:30 p.m. Monday evening.
Initially, the police had at least five and possibly seven other suspects. Sawyer *283 was initially interviewed by the police with other tenants and bystanders on the same day Janet's body was discovered. During the suppression hearing, testimony revealed that after Sawyer's initial interview the day Janet's body was discovered, the police immediately considered him to be their prime suspect because they considered his demeanor to be suspicious, as he displayed curiosity about the killing, and because his face flushed and he became embarrassed during the initial questioning. The next day, the police invited Sawyer to the police station for an interview. Sawyer agreed as he thought the police needed his help. The interview was scheduled for Thursday, November 6, 1986 after Sawyer got off work from his job at a golf course. Prior to the interrogation, the police conducted a background investigation of Sawyer during which time they interviewed Sawyer's parents and his employer.
Police officers had been stationed around Janet's apartment and were observing Sawyer. On Wednesday, two officers were placed in Janet's apartment to conduct surveillance of Sawyer. The next day, in preparation for Sawyer's appearance at the station, the police officers in charge of press relations and the polygraph examiner were asked to stay beyond their normal working hours in anticipation of a break in the case.
At that time, Sawyer was a thirty-three-year-old acute, recovering alcoholic who had excessively indulged in alcohol since he was seventeen years old in order to deal with an anxiety affliction. This affliction caused him to sweat profusely and become red in the face when he felt people were critically observing him. During the suppression hearing, there was no dispute among the numerous experts who testified that Sawyer suffers from acute anxiety and an obsessive compulsive personality disorder. The defense experts maintained that his anxiety affliction and personality disorder makes him very vulnerable to suggestion, anxious to please others  especially authority figures, and capable of giving up his own value or belief system. At the time of the murder, Sawyer had not been drinking for the previous thirteen months, was a member of Alcoholics Anonymous, and regularly attended a club for AA members three or four times a week. However, before Sawyer stopped drinking, he would customarily consume a liter of vodka a day and at times suffer from vomiting, delirium tremens and alcoholic blackouts.
At the time of the interrogation, the police were aware of Sawyer's alcoholic history, that he had gone to bed at 2:00 a.m. Thursday morning, gotten up at 5:30 a.m. to be at his job at 6:30 a.m., and had worked at his golf course job until 3:00 p.m. on Thursday afternoon. The interrogation began at approximately 4:10 p.m. Thursday afternoon and ended at approximately 9:30 a.m. Friday morning.
When the police arrested Sawyer at the end of the interrogation, they charged him with first degree murder and sexual battery. They later nolle prossed the sexual battery charge because the acts of which they accused him and which he admitted during the interrogation were not substantiated by the evidence. Rather, the alleged facts of the sexual battery, which the police supplied and suggested to him during the interrogation along with many of the key facts regarding the murder itself, were subsequently discovered to be totally false.
During the hearing, an FBI hair and fiber expert testified that the one unknown pubic hair found under the kitchen windowsill had not been forcibly removed and did not match the other unknown hairs found in Janet's apartment. The hair matched Sawyer's pubic hair sample in all twenty observable characteristics. The expert stated this did not mean that the hair was absolutely identified as belonging to Sawyer, but rather, that the hair came from someone within a class of individuals having the same hair characteristics as Sawyer. Janet had sat on an upholstered chair in Sawyer's apartment a few days before her murder. Sawyer denied ever being in Janet's apartment.
The expert described the methods by which hair is transferred from one location to another, and stated Sawyer may have been in the victim's kitchen or the hair may *284 have been transferred secondarily. A concrete slab would be a likely surface for hair transfer. A person jumping from the windowsill wearing only socks could drop a hair in the kitchen. The FBI agent also testified that numerous people walking in and out of a crime scene area where evidence is being collected violates the concept of preserving the crime scene and may result in contamination. People and equipment at the crime scene and even Janet's body could have contaminated the kitchen area. He could not testify as to how a given hair gets to a particular location, especially in light of extensive contamination.
In its order, the court stated that the hair was relevant only if its presence in Janet's kitchen was probative of Sawyer's presence in her apartment at the time of the offense. The court noted that the hair had been collected approximately eleven hours after the police found Janet's body, that several other unknown hairs were found on and about Janet's body, that the crime scene had been contaminated by approximately sixteen persons and heavy equipment prior to collection of the hair, and there were several other methods by which the hair may have been carried to that location, none of which were more likely than any other. The court ruled that the hair had no probative value of Sawyer's presence in Janet's apartment at the time of the murder, or that even if it was probative, its probative value is far outweighed by the danger of unfair prejudice. Under section 90.403, Florida Statutes (1985), relevant evidence is inadmissible if its probative value is substantially outweighed by, among other things, the danger of unfair prejudice, confusion of the issues, or misleading the jury. It is the trial court's function to weigh the danger of unfair prejudice against the probative value of the evidence. State v. McClain, 525 So.2d 420, 422-23 (Fla. 1988). Furthermore, the trial court should consider the need for the evidence, the tendency of the evidence to suggest an improper basis for the jury to resolve the matter, such as on an emotional basis, the chain of inference necessary to establish the material fact, and the effectiveness of a limiting instruction. Id. (citing 1 C. Ehrhardt, Florida Evidence § 403.1 at 100-03 (2d ed. 1984) (footnotes omitted)).
In this case, the probative value of the single hair cannot be positively identified as being from Sawyer. Even if it is his hair, it is simply not probative of proving that Sawyer was ever in Janet's apartment much less that he was there at the time of the murder in light of the extensive contamination of the crime scene. However, Sawyer could have been seriously prejudiced before the jury if this hair evidence were presented to them. Accordingly, the trial judge properly ruled it to be inadmissible. However, even if the trial court's order was erroneous, it does not depart from the essential requirements of the law. Although some pretrial rulings qualify for certiorari review, that extraordinary writ is reserved for situations where "there has been a violation of a clearly established principle of law resulting in a miscarriage of justice." Pettis, 520 So.2d at 254 (citing Combs v. State, 436 So.2d 93, 96 (Fla. 1983)). We are not persuaded that prohibition of the state's use of the hair sample violates a clearly established principle of law which will result in a miscarriage of justice, and deny the state's petition.
At this point, in order to ensure the true flavor of the acts the police used here are sensed, we defer to the trial court's opinion which we hereby adopt as our own and set forth, in part, as edited, below.

OPINION
The central issue raised by defendant's motion to suppress is the "voluntariness" of Sawyer's confession, elicited by Clearwater Police Department personnel during a sixteen-hour station house interrogation on November 6-7, 1986. In addition, the defendant alleges that his Miranda rights were violated when police failed to halt the interrogation on request and when they failed to "scrupulously honor" his ambiguous request for a lawyer. It should be noted that the alleged Miranda violations may be relevant not only as separate independent *285 grounds for suppression, but also as part of "the totality of the circumstances" which this court must consider in determining voluntariness. And, as part of both the voluntariness issue and the Miranda issue concerning the right to terminate questioning, the court must also determine whether the detectives used sleep or rest deprivation to such a degree over the span of the sixteen-hour interrogation that that deprivation substantially contributed, along with other pressures, to Sawyer's will being overborne, thus rendering the confession involuntary.

I
The admissibility in evidence of extrajudicial statements or a confession by a criminal defendant is first determined by the trial court on a motion to suppress. If the court determines both that the statements were voluntary (i.e., not coerced by police personnel), and that they were obtained in accordance with the defendant's constitutional rights as elucidated by the United States Supreme Court in Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966), the statements are deemed admissible... .
In assessing "voluntariness," the court is required to consider whether, in light of "the totality of the circumstances" surrounding the confession, coercive police activity produced that confession. See, e.g., State v. LeCroy, 461 So.2d 88 (Fla. 1984), cert. denied, 473 U.S. 907, 105 S.Ct. 3532, 87 L.Ed.2d 656 (1985).
Case law reveals that the "totality of the circumstances" may include police conduct and interrogation techniques used by the police; the duration and nature of the questioning; the physical setting in which the interview occurs; the content of the confession-product, which, although not determinative, may shed light on whether it was "voluntary" or not; the mental condition and psychological makeup of the accused, and his history and background; the age, legal sophistication, intelligence, and education of the suspect; and all other factors which may assist the court in its determination.
The United States Supreme Court has recognized that ... the proverbial third degree ... has been replaced by more subtle psychological interrogation techniques, with more emphasis on the mental makeup of the individual defendant:
[A]s interrogators have turned to more subtle forms of psychological persuasion, Courts have found the mental condition of the defendant a more significant factor in the `voluntariness' calculus. See Spano v. New York, 360 U.S. 315, 79 S.Ct. 1202, 3 L.Ed.2d 1265 (1959). But this fact does not justify a conclusion that a defendant's mental condition, by itself and apart from its relation to official coercion, should ever dispose of the inquiry into constitutional `voluntariness.'
Colorado v. Connelly, 479 U.S. 157, 107 S.Ct. 515, 520, 93 L.Ed.2d 473 (1986).
Thus, while this court must consider Sawyer's "mental condition" in assessing voluntariness, its emphasis must be on the impact of coercive police conduct on that mental condition. And on this issue, the state has the burden of proving, by a preponderance of the evidence, that Sawyer freely and voluntarily, that is, of his own free will and volition, confessed to murdering Janet Staschak. Drake v. State, 441 So.2d 1079, 1081 (Fla. 1983), cert. denied, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984).
The court must also decide whether Sawyer's Miranda rights were violated during the course of this interrogation. The defendant has suggested that both his right to counsel and his right to terminate the interrogation were violated by the Clearwater Police Department during questioning. On these issues, the United States Supreme Court has stated as follows:
If the individual indicates in any manner, at any time prior to or during questioning, that he wishes to remain silent, the interrogation must cease. At this point he has shown that he intends to exercise his Fifth Amendment privilege; any statement taken after the person invokes his privilege cannot be other than the product of compulsion, subtle or *286 otherwise... . If the individual states that he wants an attorney, the interrogation must cease until an attorney is present. At that time, the individual must have an opportunity to confer with the attorney and to have him present during any subsequent questioning. If the individual cannot obtain an attorney and he indicates that he wants one before speaking to police, they must respect his decision to remain silent. (Emphasis added).
Fare v. Michael C., 442 U.S. 707, 717, 99 S.Ct. 2560, 2568, 61 L.Ed.2d 197 (1979) (quoting Miranda, 384 U.S. at 473-74, 86 S.Ct. at 1627-28).

II
We must now apply these rules to the facts of this case. We know Sawyer was critically viewed by the Clearwater Police as a suspect, along with other suspects in the case: Leo Brown, Rick Giebel, Claude Hensley, Carl Phillips, Nicholas Rohac, and possibly two mysterious unknowns, Kevin Moberly and Ron Nikolaus. Sawyer, however, attracted the most attention. Detective Dean testified that, at first meeting Sawyer, he observed the red flushed face, the sweating reaction upon initial questioning, which caused Dean to develop what he described as a "hunch" about Sawyer's possible guilt. Dean was likewise aware this murder was unusual in its methodical arrangement of evidence and clear indications of a sadistic killing. The testimony at the hearing revealed that F.B.I. Agent Stan Jacobsen was consulted by Dean and Fire to give a psychological profile of the type of killer who would commit this crime. Outside perimeter security police reported Sawyer's repetitious acts of opening his refrigerator, taking nothing out, but staring out the windows each time; a secret surveillance "stakeout" from within Janet's apartment next door reported Sawyer's movements and running water. These observations were all part of a preparatory effort preceding Sawyer's arrival at the police station Thursday afternoon, November 6, 1986. Checking the Serenity AA Club on Wednesday, November 5, confirmed Sawyer was an alcoholic. Thursday afternoon interviews with his parents and his employer at the Cove Cay Golf Course were also done in preparation for Sawyer's interview. The detectives by this time were themselves anxious to begin.
When Sawyer arrived at 4:00 p.m., his attitude was friendly and cooperative. Sawyer's father testified that the night before going to the police station, Sawyer had told his parents of the pending police interview, and he had told his father that he was not concerned; his attitude was to help the police solve the murder. Sawyer's friend, Philip Dowse, at the Serenity Club, testified Sawyer was not afraid of the police interview; Dowse thought he looked forward to it, wanting to be helpful.
The interview started promptly at 4:10 p.m. It was, as anticipated, friendly and informal. Sawyer was asked about his family and personal background, revealing in the process his acute alcoholic background, his blackout experiences, the deep depth of anxiety in his life, and his innermost private thoughts about himself. Sawyer was unaware that he was arming two sophisticated and experienced homicide detectives with the means to penetrate his personality and failings.
The medical evidence at the hearing is essentially in agreement: that Sawyer is an alcoholic, suffers a personality "disorder" called "obsessive compulsive," and has acute anxiety. The excess sweating, the redness and flushing of his facial complexion, is totally involuntary, proceeds as if without warning and is uncontrollable. This condition started in Sawyer's teens while he was still in high school, and remains unabated even to the date of the suppression hearings before this court.
The court believes and the record shows Sawyer is competent, of average intelligence, is not psychotic, knows right from wrong, and does not present to the court a mind that is so ill that his confession can be said to be a product of a deranged or psychotic mind. But we do have a personality disorder.
*287 The disagreement among the experts was not about the psychological classification of Sawyer, but, rather, the degree of his mental capacity to be influenced in his thinking. Dr. Sidney J. Merin, who testified for the state, believed Sawyer was not subject to being "overborne" by police coercion in his sixteen hours of interrogation; but even he qualified that opinion by stating it was not absolute. The state, despite its burden, actually produced no medical opinion or expert on thought control or brain washing, to assess the interrogation's impact on Sawyer's thought processes.
The defense experts expressed a unanimous view that Sawyer's confession was coerced by the cadre of detectives, who worked for sixteen hours nonstop, successfully applying various psychological techniques to produce a confession.
The court has repeatedly reviewed the interrogation and the tapes and believes that based on its own analysis, the interrogation went through several distinct phases. First, there was a preliminary family or psychological profiling effort made by the detectives to find out who Sawyer was. Second, the detectives instituted a guessing game of questions not unlike "charades," the "scenario," that used leading questions to nudge the defendant to adopt the facts as known to or believed to be known by the police about intimate details of the crime. Third, there was a progressive process of accumulating what the detectives called "elimination evidence," whereby they got the suspect freely to supply fingerprints, footprints, hair from the scalp, pubic hair, blood, saliva, and the keys to his apartment and car, without his knowing or appreciating the fact that he was the prime murder suspect. Fourth, there was a disarming dialogue proceeding the Miranda warnings, so as not to let Sawyer know he was a prime suspect, but to imply that instead this was a monotonous legal ritual that really meant nothing. Fifth, came a shock, an accusatory approach where Sawyer was now told he was the murderer. Sixth, Sawyer was plied with repeated efforts to get him to accept a confession based on an accidental, unintentional killing. Seventh, there were the pre-polygraph buildup and Sawyer's emphatic denials of guilt. Eighth, the police attempted an intense accusatory effort to avert the polygraph test (that Sawyer thought would prove his innocence), which was probably done to "prime" Sawyer to fail the test. Ninth, Sawyer was given a last-chance opportunity to accept the proposed "accident" approach, called "the rope" technique, prior to handing him the bad news of having failed the polygraph test. Tenth, the police made a sudden shift to first degree murder instead of accidental killing. Eleventh, the "hallway" meeting occurred, off the record, where a deal may have been made to admit "the truth" in return for favored overtures to the state attorney's office. Twelfth, there was the "I don't believe I did it" phase where Sawyer was losing contact with his own belief system and wondering if he could kill and not remember. Thirteenth, the "blackout" theory was substituted by all concerned, a substitution of theory for reality. Fourteenth, the confession in the first person took place. Fifteenth, the interrogation was renewed by yet another detective. And finally, Sixteenth, Sawyer explosively denied the entire confession after the effects of sleep deprivation had worn off.
The law requires the court to consider the entire interrogation process through each of its stages, to determine if the state has met its burden of proof by a preponderance of the evidence adduced at the hearing, that Sawyer's confession was not the product of police coercion, overreaching, threats, promises or the like. In other words, the state must prove that Sawyer's confession was free and voluntary.
The content of the interrogation, as observed by Dr. Ofshe in his testimony, is itself fraught with difficulties. For instance, and without attempting to detail all the contradictions, Sawyer admits to killing Janet in his own apartment. Sawyer then changes the killing to her apartment. He denies sex, then denies vaginal sex, then admits anal sex; the state has no forensic proof of any sex. Sawyer admits to having hit Janet, then he pushed Janet, then she *288 died hitting her head on the sofa, or hitting her head on the wall, or on the floor. He next admits killing her with an object, first a lamp and then an ashtray. Sawyer states Janet had blood coming out of the back of her head, not gushing; but the medical examiner reports no injury to the back of the head and no external evidence of blood. Sawyer admits to swinging an ashtray in Janet's apartment in a round house blow to the side of her head and taking the ashtray to the Tampa Airport to discard. There is no missing ashtray from Janet's apartment. He says he parked Janet's car in an outside parking lot; it was instead found on the fifth level of the indoor parking garage. He first takes a taxi from the airport to the end of the Howard Franklin Bridge and walks home. He takes a taxi to St. Petersburg and another taxi to Clearwater. He takes a taxi over the Clearwater Causeway to downtown Clearwater and walks home. All the missing items, the purse, the wallet, the panties, he says, are in his apartment. None were found, there or anywhere. No taxi driver was ever found who transported Sawyer. The transcript of the interview is replete with such contradictory statements to such a degree that one must select which answer applies and reject those inconsistent with one's own theory of the killing.
It is a hodgepodge of detail, a substantial amount, if not all, emanating from the "scenario." The scenario is filled with grossly leading questions put by the detectives, repeatedly suggesting the answer desired or believed correct, whether or not it is later proven by independent lab tests from the forensic evidence gathered at the crime scene. There are other problems with the "scenario." Possible information breaks in the police security detail posted around the York Apartments led to gossip and stories circulated among apartment dwellers, onlookers, and the press. All of this took place before Sawyer entered the interrogation room, and which may have influenced his answers as to how Janet was found: naked, upstairs, on a water bed, raped, strangled, stabbed, and tortured.
The tapes reveal that Sawyer was harangued, yelled at, cajoled, urged approximately fifty-five times to confess to an accidental killing, promised assistance with the state attorney's office if he did "tell the truth," threatened with first degree murder and its attendant consequences if he did not cooperate, warned what happened to a fellow policeman in Clearwater who played games during his interrogation and got charged with first degree murder, threatened that he would return to alcohol from remorse if he did not admit the killing, and even threatened with eventual death from excess alcohol consumption.
The state has the clear burden of proving by a preponderance of the evidence that none of the factors outlined by Dr. Ofshe, in the totality of the circumstances of this interrogation, overcame Sawyer's will so as to render his confession to the killing of Janet Staschak "involuntary."
The court must address the traditional legal indicia of coercion as outlined in Colorado v. Spring, 479 U.S. 564, 107 S.Ct. 851, 857, 93 L.Ed.2d 954 (1987), wherein the United States Supreme Court states that:
[T]he traditional indicia of coercion [include] the duration and conditions of detention ..., the manifest attitude of the police toward [the suspect], his physical and mental state, [and] the diverse pressures which sap and sustain his powers of resistance and self control... . [The issue is whether the suspect's] will [was] overborne and his capacity for self-determination critically impaired because of coercive police conduct.
The record in this case shows sleep deprivation to be one of the critical factors. It is difficult to assess the psychological impact it had on Sawyer's thinking processes. The tape recording reveals loud sounds of yawning by Sawyer as the early morning hours arrived, his protestations of wanting to sleep, to rest, to lie down, all ignored and deliberately utilized by the detectives to taunt Sawyer into confessing so that he, and they, could get some needed rest. Rest, they told Sawyer, was not a priority, despite their knowing that Sawyer in his last twenty-four hours before entering the *289 interrogation room had had only three hours' sleep and an arduous outdoor workday as a groundskeeper at a golf course.
The police, according to Fire, set for themselves an artificial time table. The crime had the best chance of being solved within twenty-four to thirty-six hours after the killing, and the detectives rushed, without waiting for any forensic proof to demonstrate Sawyer's presence in Janet's apartment. Sawyer was diagnosed as suffering an obsessive compulsive disorder; it seems everything connected with his interrogation was on a compulsive time table to move as quickly as possible. As we now know, the haste produced lost evidence, missed evidence, overlooked evidence, and no fingerprints, footprints, sperm, blood, scalp hair, fibers or anything else proving Sawyer was in Janet's apartment on the alleged night of the killing, Saturday night.[*]
Sleep deprivation caused Sawyer to complain about even his arm going to sleep. There is also evidence of significant confusion in Sawyer's mind, as when the detectives asked if he wanted them to contact his parents, and he replied incorrectly that he had already told them he was "in jail." This certainly indicates disorientation, but the detectives ignored that.
The most puzzling aspect of this entire interrogation is whether Sawyer confessed to a killing because he recalls doing it, or merely accepted the suggestion that he did the killing during an "alcoholic blackout" and therefore cannot recall the details of this otherwise bizarre killing.
There was no evidence Sawyer resumed drinking that Saturday night, having been abstinent for the preceding thirteen months. Medical testimony at the suppression hearing was unanimous that a "dry blackout" is not possible. Only the alcohol can induce the brain cells to turn off. In the words of Dr. David Tingle, the tape recorder in the brain stops with the alcohol.
What finally persuaded Sawyer to abandon his belief, to disregard his senses that told him he didn't commit the murder and to embrace the idea that he did, is the crux of the perplexing issue that faces the court.
Detective Fire actually ran an intellectual "wrestling match" with Sawyer, trying to hold him within the concept that Sawyer should disregard his reliance on his own senses of what happened on the night of the killing, accept the blackout theory, and "picture" what could have happened. Sawyer also accepted Fire's suggestion that he imagine or "picture" what it would have been like to do the killing, which he does not recall because of a blackout.
Fire had no proof at the time of the interrogation that Sawyer committed the killing, because no lab reports were available which could confirm Sawyer's complicity in the crime. [It should be noted that the lab reports are available now, and they still fail to confirm Sawyer's complicity in the crime.]
Fire and Dean therefore had to assume the "scenario" proved that Sawyer committed the crime. Fire had to restructure the "pictures" for Sawyer consistent with the "scenario." Sawyer's pictures became confused, rambling, contradictory, and most significant of all, Sawyer didn't believe the pictures at all. He repeatedly said that, and finally rejected the idea altogether.
The detectives' fundamental premise for all of their thinking is, therefore, the "scenario," which was critically analyzed by Dr. Richard Ofshe, the only true expert on "thought control" at the hearing. Dr. Ofshe testified that the "scenario" was essentially the product of manipulative forms of leading questions designed to achieve a desired result. The "scenario" technique, as such, is a well-recognized police interrogation tool, but in this instance, it may have achieved the wrong result.
Warren Holmes, the polygraph expert, stated that the "scenario," as well as all the other interrogation techniques he recognized *290 in the transcript, have been used by him many times. The "scenario" technique has an implicit danger, he warned, and that is the possibility of obtaining a "false confession." In Holmes' opinion, Detectives Dean and Fire should have recognized that they had taken just that, a "false confession," from Sawyer. Dean testified he had no special training in interrogation techniques as such, and Fire, while longer in the field of homicide interrogation, admitted he was unaware of the problem.
Holmes further testified that the polygraph test utilized by the police with Sawyer is also very perplexing in this case. Detective Little testified he had advised Sgt. McAuley that Sawyer should not take the polygraph test because Sawyer might be tired from undergoing long hours of interview and accusation; in order to be accurate, Sawyer's test should be delayed a day or two. Detective Little was overruled by Sgt. McAuley. However, Sgt. McAuley disputed that Little made his doubts that clear. In any event, the issue exists. Sawyer, when advised the test was to begin, was shaking, nervous, and sweating. Despite a grueling accusatory lecture by Fire preceding the test to the effect he did not need it and he should get on with confessing, Sawyer marched into the test room at 9:00 p.m. to complete the process by 11:56 p.m. Sawyer said he needed the test to prove to Dean and Fire they were wrong in accusing him, and that he needed to prove his innocence.
Dean subsequently announced the results: the test proved Sawyer a "liar," the worst results ever in Det. Little's experience. It blew the needles "off the screen," said Dean. Sawyer's heart was talking to him, his conscience; Sawyer's belief in his own innocence was useless. For some strange reason, the test results were not immediately available (within ten minutes of completion, which would have been normal according to Holmes), but were held about an hour and fifty minutes. There was also no standard post-test run on Sawyer, a "confirmation test" on the validity of the confession, nor a "missing evidence" test.
Following the one test came the shift in tactics  a first degree murder dialogue. The hours of "accidental killing" dialogue, a theory that was relentlessly pushed on Sawyer as a lesser crime, were abandoned. What followed was less than a subtle reminder that they who do not cooperate get first degree as against those who tell "the truth" and cooperate. Goatcher was then sent in to revive the "accident" approach. It was a last-ditch effort to get the confession on the heels of the failure to pass the test. Then some sort of "off the record" discussion took place in the hallway between Fire and Sawyer. Following that, the confession comes forth in a halting, hesitating, ambiguous, and utterly confusing fashion.
Dr. Golloway testified Sawyer told him about the hallway discussion: that Fire reminded Sawyer they had his prints in the victim's apartment (not true) to compare with his DUI prints, that Sawyer knew what first degree in Florida meant, and that if he told the truth, something could be done to help him with the state attorney's office.
Holmes, in this case, for the first time in his career, evaluated the results of another polygraph examiner. These results he challenged. He stated his testing of Sawyer did not confirm Little's results, and, in fact, Detective Little's scoring was incorrect. In Holmes' opinion, Sawyer did not lie. Holmes' review of the transcript of the interrogation revealed what he described as a "set-up" to make Sawyer flunk the test. The impact on Sawyer was devastating. In addition, official police trickery had led Sawyer to believe, falsely, that the scientific methods used by the police had exposed Sawyer's prints and hair to be in Janet's apartment. [There has never been an explanation of why the blood and hairs found on and about Janet's body, belonging to mysterious but unknown suspects, were considered less important than the one pubic hair found downstairs in the kitchen.]
The cumulative weight of enforced sleeplessness, doubtful polygraph test results, the lengthy sixteen-hour serial team interrogation *291 with no meaningful breaks, the "scenario" of unabashedly leading questions, the denial of requests "to rest," the implied inducements to make a deal for favored consideration, the threat of a return to drinking, the use of Sawyer's known blackout history to undermine his reliance on his own memory, and the refusal to honor his Miranda rights (see below)  these tactics taken together appear to fall within what our United States Supreme Court said could "sap ... [Sawyer's] powers of resistance and self-control ... [overbear his] will ... and [critically impair] his capacity for self-determination." Colorado v. Spring, 107 S.Ct. at 857 (citations omitted). That being the case, the state has not met its burden that Sawyer's confession was freely and voluntarily given without police coercion.

III
It is apparent, even if the confession is considered freely and voluntarily given without any police coercion, there remain two possible Miranda violations: whether Sawyer invoked his rights to be represented by "a lawyer" on two separate occasions, and whether Sawyer attempted to "cut off" the interrogation... .
Sawyer was asked if he wanted to take a polygraph test, as follows:

Dean: Do you want to take a polygraph test? Do you want 

Sawyer: Take a polygraph test? How do they work?

Dean: The guy that operates it will have to explain to you. It's very technical. Like everything today.

Fire: We don't want to tell you and not be absolutely true.

Dean: We are not certified operators.

Fire: He's certified at it.

Sawyer: Huh?

Fire: The operator. He's certified at it. If you take it now, that's it. It's over with.

Sawyer: Yes, I'll take it but  I don't know if I should have a lawyer with me or whatever that was that you read?

Fire: Miranda. It's up to you. Take it or not. Take the polygraph or not.

Sawyer: I'm just so nervous now, if you flunk it by shaking or something 

Fire: No, he explains it to you.

Sawyer: All right, lets go.

Fire: Oh no, he's got to get it ready. He'll explain it all to you... .
This dialogue definitely raises the question as to whether Sawyer was in a quandary about having a lawyer at this critical juncture in the interrogation. It had been at least an hour since the Miranda warning was given to him about 8:00 p.m., after the scenario phase. He had been told he was the murderer by the detectives, that all the evidence was stacked against him. This was Sawyer's last desperate chance to prove his innocence to his accusers.
Sawyer clearly asked Fire, "Whatever that was that you read?" Fire did not respond by rereading Sawyer his Miranda warning or, better yet, restating his constitutional rights to have a lawyer with him at every stage of the case. Fire ignored the request for amplification of his legal rights. All Fire said was "Miranda." That is a bland response considering the magnitude of the situation and that Sawyer was at the crossroads of his life. It is worse yet if we accept Holmes' theory that Sawyer was being set up to flunk the polygraph. Surely a lawyer would have warned Sawyer of the critical mistake of taking the test after hours of interrogation and accusation, his mental and physical state of nervousness and sleep deprivation, and his hands shaking with sweat.
In Drake, 441 So.2d 1079, 1081-82 (Fla. 1983), the Florida Supreme Court stated:
Once Drake had expressed his desire to have counsel, the only permissible inquiry would be to clarify an equivocal request. Nash v. Estelle, 597 F.2d 513 (5th Cir.), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979).
In Long v. State, 517 So.2d 664, 667 (Fla. 1987), cert. denied, 486 U.S. 1017, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988), our supreme court pointed out that while numerous states stop all interrogation on an equivocal request for a lawyer:

*292 [W]e have not accepted this view and have characterized similar statements as equivocal which permit an investigating official to continue questioning for the sole purpose of clarifying the equivocal request. In so holding, we made clear that, until clarified, this is the limit of the permitted inquiry.
For further amplification, the supreme court referred to Cannady v. State, 427 So.2d 723, 728 (Fla. 1983), wherein they said:
When a person expresses both a desire for counsel and a desire to continue the interview without counsel, further inquiry is limited to clarifying the suspect's wishes.
Case law from other states, cited in the Cannady opinion, quotes equivocal statements almost identical to Sawyer's, such as "Maybe I should have an attorney." In the Long case itself, it was, "I think I might need an attorney."
Sawyer's statement "I don't know if I should have a lawyer with me" is an equivocal statement. Sawyer even asked for clarification of his legal right to an attorney. All he got was the single word, "Miranda."
During the suppression hearing, Fire attempted to take the position that when he said, "It's up to you," that was an effort to clarify Sawyer's wishes. A simple reading of the context of what was said, "It's up to you. Take it or not. Take the polygraph or not" leaves no doubt in this court's mind that the real choice was polygraph or not. There was no discreet inquiry to clarify the equivocal nature of Sawyer's request for a lawyer. Rather, this was one more example of the detectives' "rush to judgment." It is a clear violation of Miranda and all inquiry should have ceased except to clarify the constitutional safeguards imposed on the interrogation. This means the confession, even if valid in a voluntary sense, must be suppressed.
The next time Sawyer requests a lawyer, it is not equivocal. It is clear, understandable, and nonavoidable. This request comes late in the interrogation process  and it, too, was ignored by the police.
Detectives McAuley and Fire are reinterrogating Sawyer after allowing him his first chance to sleep. He had been allowed one and one-half hours after over twenty-four hours of being awake. Sawyer interrupts their questioning to inquire "Can I talk to somebody?" Fire then asks:

Fire: Who? Who do you want to talk to? You tell us. You tell us. You said that before. We said `Who do you want to talk to?'

Sawyer: OK. Do you know if there is any member of the police force that is in the AA program?

Fire: Not to my knowledge. Do you need somebody from AA?

Sawyer: Yea. It may sound funny, but 

Fire: No, it doesn't sound funny Tom.

McAuley: This will be your closest friend, right?

Sawyer: Yea.

McAuley: It don't sound funny to me.

Sawyer: But if there was a police woman or man that was in the program 

Fire: If there was I'd bring him right here to you. I'd bring him right here to you.

McAuley: See a lot of times  like to you know, you only use first names in the program.

Sawyer: Right. And that's where I'm messed up. I know a lawyer named Chet. I haven't seen him for a long time. I don't know his last name.

McAuley: Well that's the problem we would have. They don't. You know the person that attended AA normally doesn't let anybody else know about it.

Sawyer: Well a lot of them do... .
The detectives thereupon steer the interrogation away from the request for an attorney. They go back to asking Sawyer to help them locate missing items belonging to Janet of which only he, presumably, would know the whereabouts, namely a purse, a wallet, and underwear. Sawyer, however, redirects the inquiry back to the subject of a lawyer and says:

*293 I can get somebody to come down here, but I want a professional like a lawyer or a policeman or something. Not just anybody that's gonna go `yeah, yeah, Tom, yeah, yeah.' Somebody that knows crime. That  you know what I mean ...?
Fire replies, "No, I don't know what you mean, Tom. That knows crime. What do you mean?" and Sawyer lays it on the line. He wants someone "that just knows crime."
It is not credible that, in a criminal homicide investigation, it is necessary to tell the detectives that a criminal investigation is underway and the suspect needs a lawyer. Yet, how do these highly experienced detectives respond to this Miranda request? McAuley asks: "Are you having a hard time telling us where the screen is and the knife is?" Sawyer appropriately replies, "That's out of mind now."
The detectives disregarded this unequivocal request for a lawyer. They launched once again into their previous line of questioning, seeking the location of incriminating articles under the false pretext that only Janet's family wanted them. Sawyer politely and cooperatively offers some replies to their divergent inquiries, but interrupts for a third time, saying, "I need to talk to somebody else." It is clear that Sawyer needed to talk to someone, preferably a lawyer.
Fire then gratuitously says:
We want you to talk to anybody that you want to talk. OK? We told you that long time ago. Give us a number. Somebody that we get for you. I can't pull somebody out of the clear blue sky that belongs to the AA.
There is no court decision that states a suspect may not invoke his Miranda right to counsel unless at the time of the request the suspect can give the lawyer's last name and produce a telephone number so the police can make the necessary contact. The truth of the matter is, "Chet" was a well known lawyer in Clearwater and is listed that way in the phone directory. It is possible the police didn't know the Clearwater Bar Association could suggest who "Chet" was? The Miranda case mandates that all interrogation cease at the request for a lawyer. In Long, 517 So.2d at 664, our supreme court suppressed a confession because the equivocal phrase "I think I might need an attorney" went unheeded by the police, who continued to pursue the interrogation on the belief "nothing had changed."
In this instance the express statement that Sawyer wanted a lawyer was challenged by McAuley's incredible inquiry: "Does this have something to do with the screen and knife. I'm lost."
Sawyer once again replied, "No, it does not. It doesn't have nothing to do with the screen and knife."
McAuley either did not understand the request for a lawyer, which the court cannot accept, or he was deliberately diverting Sawyer away from such a request in order to achieve a waiver of Sawyer's Miranda rights. The court believes it was the latter because McAuley once again asked about the cut screen and said, "Is it in your apartment underneath the rug in your living room?"
Sawyer finally exploded in the face of such obstinacy by the detectives, in pursuit of his legal demands, and said:
The truth is  the only reason I'm telling you this stuff is because you got evidence to get me. I don't believe I did it. That's why I want to talk to somebody. I'm going fucking bananas.
What did the detectives do in response? They merely packed Sawyer off to be booked at the Pinellas County jail. In summary, there could not be, in this court's opinion, a more classic example of the violation of Miranda than what occurred after both the equivocal request, and the unequivocal request for a lawyer. The police response to latter request illuminates the earlier one; the police honored neither.

IV
Sawyer's right to control questioning is well fixed by Miranda and its progeny. In Shriner v. State, 386 So.2d 525 (Fla. 1980), cert. denied, 449 U.S. 1103, 101 *294 S.Ct. 899, 66 L.Ed.2d 829 (1981), our supreme court touched on this point by quoting from the opinion of the United States Supreme Court in Michigan v. Mosley, 423 U.S. 96, 103, 96 S.Ct. 321, 326, 46 L.Ed.2d 313 (1975):
The critical safeguard identified in the passage at issue is a person's `right to cut off questioning'. .. . Through the exercise of his option to terminate questioning he can control the time at which questioning occurs, the subjects discussed, and the duration of the interrogation. The requirement that law enforcement authorities must respect a person's exercise of that option counteracts the coercive pressures of the custodial setting. We therefore conclude that the admissibility of statements obtained after the person in custody has decided to remain silent depends under Miranda on whether his `right to cut off questioning' was `scrupulously honored.'
The facts of this case show that after Sawyer was told that the polygraph test results showed him to be deceptive, a liar, "no ifs, ands or buts," Dean said the curtain had to come down on "Sawyer's stalling tactics." They wanted a confession promptly. Sawyer persisted: "I don't believe I did it." The following colloquy then took place:

Fire: Now you're saying you don't believe you did it?

Sawyer: I still don't believe I did it and you say that something is blocking it out. Well then it must be, but I can't accept that I did this.

Dean: Why can't you accept it?

Sawyer: Because I honestly truly don't believe I did it.

Fire: You just said a minute ago you don't believe you did it. Now you said I truly believe I didn't do it. What is the truth? You probably or I did? Or do? Who are you bull-shitting?

Dean: You're only bull-shitting yourself, Tom. Come on, you were emphatic that you didn't do it. Now you're saying I think I block it out, I can't accept.

Sawyer: No, I'm saying I didn't do it.
Dean reminds Sawyer that his explanation of coming home Saturday night at 9:30 p.m., watching T.V. and going to bed was totally devoid of specifics. This suggests to Dean that Sawyer had a "blackout." Dean asks:

Dean: Is that the blackout? Is that how it works? When you used to get drunk and blackout, is that how it used to be?

Sawyer: Yeah.

Dean: Have you ever had that experience without booze?

Sawyer: No.
Fire goes on to remind Sawyer that he is an alcoholic, that he killed somebody this time, presumably in a blackout, and that he can't recall it because of his blackout; Sawyer finally admits that he wasn't positive that he didn't do it. They ask why. Sawyer says:
I don't know. I'm thinking I had a blackout. Now, I never heard of a blackout when you haven't been drinking.
This type of conversation goes back and forth until Dean steps out of the room and returns with Detective Little, who says:
Tom, you really ripped that bad. I'm not kidding you. It's one of the worst I've ever scored as far as indicating deception, lying. I've never had one come out that bad. Of course, homicides are when you gonna come and show that, like you ... you'll get your highest score in that particular area... .
Detective Little leaves the room, remarking to Sawyer it is "time to pay your dues." Sawyer still maintains he doesn't "remember doing it" but he concedes they almost have him convinced; he doesn't know. Upon Sawyer's saying that, Dean comes back into the room and says:

Dean: It's over. It's all over. There's no tomorrows. It's over tonight. This is the end. There's no going back.

Fire: Do you hear?

Dean: There's no getting away from this. There's no running away. Tell us what you remember.

Sawyer: I don't remember anything.
*295 Then pushing him to remember and to describe how he got back from the Tampa Airport, the detectives continue:

Dean: Was it a cab or a limo? Huh? Which was it?

Fire: It was a cab. Tell us why.

Dean: Talk to me, Tom, Which was it, Tom?

Sawyer: I'm done talking. I  I'm sorry. I don't remember.
The court must decide if this statement, "I'm done talking," is an invocation of Sawyer's right to "cut off" the interrogation which Miranda gives him.
In Shriner, the court says the detectives must "scrupulously honor" the request. Did Fire make a "discreet" inquiry of what the suspect had in mind when he said he was "done talking?" Did Fire appear confused? Apparently not, because he immortalized the occasion with the following:
What's wrong with you? You sit there. I'm done talking. That's bullshit, Tom. That's bullshit. You're done talking, Tom? You ain't told us shit. You're done talking. You ain't told us a goddamn thing, except for the scenario before... .
This broadside by Fire at the mere suggestion that Sawyer had a legal right to terminate the interrogation, for whatever reason, directly conflicts with Miranda.
It is true that Sawyer succumbs and resumes answering the interrogators' questions, but the questioning represents the same continuing line of interrogation previously pursued with respect to how Janet was cut, strangled, found naked, raped and the scenario itself. This does not fall within the Mosley exception which allows discussion of a separate, distinct crime or subject matter with the suspect after the passage of a significant period of time following cessation of the interrogation. See United States v. Vasquez, 476 F.2d 730, 732 (5th Cir.), cert. denied, 414 U.S. 836, 94 S.Ct. 181, 38 L.Ed.2d 72 (1973). We have here an act of avoidance of legal responsibility. Detective Fire persisted in his repeated efforts to wear down Sawyer's resistance and to keep him talking. Sawyer got the same consideration for wanting to stop the interrogation that he got when he asked for a lawyer. The Court finds this is a clear, unmistakable violation of Miranda.
There is a pervasive aspect to this entire interrogation, which runs consistently throughout and which the court will discuss here separately. It is relevant both to the voluntariness issue and to Sawyer's Miranda rights to cut off questioning. This centers on the persistent police refusal to allow Sawyer, a citizen, his constitutional rights, by using sleep deprivation. It fits uniquely within the intimidating process of the detectives. Sawyer literally pleaded to be allowed to sleep or to rest. The time was well past midnight or more likely near 2:00 a.m. Fire pressed for additional answers on what happened Saturday night, realized Sawyer wasn't responding, and said "Tom? Hey?" Sawyer replied:

Sawyer: I need to rest.

Fire: So do I. We all need to rest. That's why you need to tell us the truth.

Sawyer: I got 

Fire: You got to what?

Sawyer: I didn't say I gotta 

Fire: What were you gonna say?

Sawyer: I just gotta lay down and rest.
There is no visual recording of this interview as there is a tape recording. During the court's listening to the tapes, however, there are audible yawns by Sawyer, and they occur in the wee morning hours.
Fire seized on this demonstration of exhaustion to dally, in effect, to tantalize, to tempt Sawyer into telling the truth as the detectives saw it. That is, confess, and he will be rewarded with sleep. This is what followed:

Sawyer: I just gotta lay down and rest.

Fire: You will. You will. You'll lay down and rest. So will I. I got to lay down and rest too. But that's not a priority now for me. It's not a priority for you neither, to lay down and rest. You know that. You haven't been able to sleep well anyways. Not since this thing come down. You'll rest. You'll be able to lay down and rest, but right now it's not a priority, like I said, and *296 it's not a priority to me. The priority is getting the truth out of you. Not getting the truth out of you, but having you tell us the truth... .
Sawyer doesn't protest, and eventually he confesses in a feeble, disjointed and confusing way. On the assured basis that the police had independent incriminating evidence locating Sawyer in the victim's apartment, which proved his guilt, he confessed. After the confession, Sawyer got his sleep, albeit one and one-half hours. The request for sleep was no more than another simple request to stop the interrogation. For reasons already stated, when Sawyer said, "I'm done talking," the request to halt the interrogation for purposes of rest involved an inviolate right to control the interrogation as announced by the United States Supreme Court. This was as much a violation of Miranda as the other violations, and, as previously noted, also contributes substantially to the court's finding that the confession was coerced.

VI (sic)
On a final note to this opinion, the Miranda warning given four hours into the interview is itself a pathetic episode. The detectives could not, of course, be certain what the scenario would bring, and they did not give Sawyer his Miranda warning before the scenario began. It was only after they thought they had sufficient incriminating admissions by Sawyer that they did give the Miranda warnings. Dean assumed this responsibility. He read verbatim from the Miranda Warning Card supplied by the state attorney's office. However, the other side of the card, received in evidence at the hearing, State Exhibit 19, was curiously not read to Sawyer. It reads as follows:
WAIVER
After the warning and in order to secure a waiver, the following questions should be asked and affirmative reply secured to each question.
1. Do you understand each of these rights I have explained to you?
2. Having these rights in mind, do you wish to talk to us now?
James T. Russell
State Attorney  Sixth Judicial Circuit
The only explanation Dean offered for not reading the waiver side of the card was that the card was clipped to his clipboard. He just didn't bother to turn it over. Dean testified that, in his handling of cases, he sometimes does and sometimes does not turn the card over.
Dean got assurances from Sawyer that he understood the Miranda warnings, and the court is satisfied that Sawyer did understand. Dean asked just that  "Do you understand that?" Sawyer said, "Yes," and Fire rejoined, "O.K."
The detectives launched right into questioning without any express waiver, and Fire leveled at Sawyer the charge that he was the killer  that he should admit it. The case decisions do not require an express waiver; an implied waiver can develop from the questioning process itself. That probably happened here. This episode underscores, however, the initial reluctance of these detectives to follow even the simplest Miranda procedures, even when they are spelled out. It is any wonder things went awry later, when complicated matters involving termination of the interrogation, rest or sleep, and legal rights to be represented by a lawyer arose in the setting in this case? I think what the court has said heretofore settles that question.

... .

VIII (sic)
In conclusion, the court believes the state has not met its burden of proving by a preponderance of the evidence, that Sawyer's confession was freely and voluntarily given without police coercion. The confession obtained was premised entirely on the scenario and that is where the technique of leading interrogatories began and that is where the suppression begins.
If, for any reason, the confession is considered not to be coerced, it still must be suppressed for violations of Miranda in the specific instances of both the refusal to *297 allow Sawyer to consult with a lawyer, and the refusal to allow Sawyer to stop the interrogation.
August 29, 1988
Gerard J. O'Brien, Jr.
Circuit Judge
As a final comment on the improper police tactics in this case, we note that over the decades, our Supreme Court has eloquently explained why the collective wisdom and heritage of this nation ensures every criminal suspect certain due process rights which cannot be abrogated by the police. Over forty-six years ago, Mr. Justice Felix Frankfurter writing for the United States Supreme Court in a decision wherein that Court suppressed a confession obtained by police after two days of interrogation observed, simply, that: "[T]he history of liberty has largely been the history of observance of procedural safeguards. And the effective administration of criminal justice hardly requires disregard of fair procedures imposed by law." McNabb v. United States, 318 U.S. 332, 347, 63 S.Ct. 608, 616, 87 L.Ed. 819, 827 (1943). Later, in Spano v. New York, 360 U.S. 315, 320-21, 79 S.Ct. 1202, 1205-06, 3 L.Ed.2d 1265, 1270 (1959), the court explained:
The abhorrence of society to the use of involuntary confessions does not turn alone on the inherent untrustworthiness. It also turns on the deep-rooted feeling that the police must obey the law while enforcing the law; that in the end life and liberty can be as much endangered from illegal methods used to convict those thought to be criminals as from the actual criminals themselves.
And in Blackburn v. Alabama, 361 U.S. 199, 206-207, 80 S.Ct. 274, 279-80, 4 L.Ed.2d 242, 248 (1960), a case dealing expressly with involuntary confessions, the Court noted:
As important as it is that persons who have committed crimes be convicted, there are considerations which transcend the question of guilt or innocence. Thus, in cases involving involuntary confessions, this Court enforces the strongly felt attitude of our society that important human values are sacrificed where an agency of the government, in the course of securing a conviction, wrings a confession out of an accused against his will.
We agree with this reasoning and strongly concur with the trial court's judgment, as substantiated by the record, that the police clearly "[wrung] a confession out of [Sawyer] against his will" in this case.
The order on the motion to suppress interrogation is affirmed; the petition for writ of certiorari on the order granting the motion in limine is denied; and the matter is remanded for further proceedings.
PATTERSON, J., and BOARDMAN, EDWARD F., (Ret.) J., concur.
NOTES
[*] There was one, lone single pubic hair found in Janet's kitchen, which has been classified by the F.B.I. as "consistent with" Sawyer's hair. However, the court has simultaneously ruled by separate order that the single pubic hair is not probative of Sawyer's presence in the victim's apartment at the time of the offense because of crime scene contamination... .