441 So.2d 1079 (1983)
Raymond Lee DRAKE, Appellant,
v.
STATE of Florida, Appellee.
No. 62185.
Supreme Court of Florida.
October 27, 1983.
Rehearing Denied January 11, 1984.
*1080 Jerry Hill, Public Defender and W.C. McLain, Asst. Public Defender, Chief, Capital Appeals, Tenth Judicial Circuit, Bartow, for appellant.
Jim Smith, Atty. Gen. and William E. Taylor, Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Drake appeals his conviction and sentence of death for the first-degree premeditated murder of Odette Reeder following his second trial, the first conviction having been reversed in Drake v. State, 400 So.2d 1217 (Fla. 1981). We have jurisdiction pursuant to article V, section 3(b)(1), Florida Constitution, and again reverse.
Late in November of 1977, Drake met Reeder at the Crown Lounge in Clearwater. At about 11 p.m. Reeder left the bar with Drake, indicating to friends that she would return in a few minutes. Her friends never saw her alive again. Her badly decomposed and nearly nude body was discovered some six weeks later. A bra had been used to tie her hands behind her back. There were eight stab wounds in the lower chest and abdomen. The body's advanced state of decomposition made it impossible to rule out other possible causes of death.
When Drake, a parolee, became a suspect, Detective Pondakos and Sergeant Coleman approached him at his work site and requested that he go to the sheriff's office for questioning. Drake acquiesced and, upon his arrival, was taken to the Crimes Against Persons office. He was given Miranda[1] warnings and told that the sheriff's department was conducting a homicide investigation in which he was a suspect. Drake at first denied having been at the Crown Lounge and ever having seen Odette Reeder. When confronted with the statement that he had been seen leaving the lounge with Reeder, he said they left together for the purpose of smoking marijuana. At this point in the interrogation, Drake requested to see his attorney. Pondakos testified that he attempted unsuccessfully to make contact with the attorney, calling three times over a half-hour period. Pondakos and Coleman then continued to question Drake, but he refused to answer. They did persuade him, however, to agree to repeat on tape the matters of which he had already spoken. The inquiry was not so limited. During the questioning he was told that he had left something at the scene of the crime and that he should try to think of what the item might be. Drake paused briefly before answering that he could not have left anything since he had not been there. The state was allowed, over objection, to introduce the tape into evidence and to elicit testimony from Detective Pondakos that the pause showed Drake was thinking about what the overlooked item could be. The state also was allowed to introduce evidence that Drake was on parole at the time of the crime. The jury found Drake guilty as charged and recommended the death sentence, which the trial court imposed.
Drake argues that, according to Edwards v. Arizona, 451 U.S. 477, 101 S.Ct. 1880, 68 L.Ed.2d 378 (1981), it was error to allow *1081 into evidence his taped statement. He explicitly requested that the interrogation cease and that he be allowed to consult with counsel. Under Edwards, further police-initiated interrogation could not be voluntary. The state argues that since Drake was not in custody pursuant to Oregon v. Mathiason, 429 U.S. 492, 97 S.Ct. 711, 50 L.Ed.2d 714 (1977), Edwards is inapplicable. Alternatively, the state argues that even if Drake was in custody, his statement was voluntary.
Our previous Drake opinion noted "a technical violation of the Miranda rule when Drake's statements to Detective Pondakos were admitted." 400 So.2d at 1220. Implicitly then, and explicitly now, we find Drake's situation distinguishable from that in Mathiason. In that case, about twenty-five days after the burglary, the suspect responded to a message to call the police and went on his own to the state patrol office after working hours. He was told specifically that he was not under arrest. Within five minutes after arriving at the office, the defendant admitted to stealing property. He was advised of his Miranda rights, and the officer who had been questioning him took a taped confession. At the conclusion of the taping the defendant was told that he was not under arrest and was free to return to his job and family. His entire stay at the state patrol office lasted about half an hour.
Drake, on the other hand, was asked to leave his work in the middle of the day to accompany the officers to the sheriff's office. Early during the course of the questioning he admitted to smoking marijuana with Reeder after having falsely denied being with her the night of her disappearance. Detective Pondakos subsequently notified Drake's parole officer of the narcotics violation and the homicide investigation and arrested Drake the same day without allowing him to leave. Drake apparently felt concern about the course the interrogation was taking, since he requested a lawyer and refused to answer additional questions. He remained silent until asked if he would answer on tape the same questions he had already answered. Detective Pondakos did not honor his agreement. Although the detective testified that Drake was probably free to leave at the time of the interrogation, there is nothing in the record to show that this option was ever made clear to Drake. On the contrary, although Detective Pondakos testified that he did not want to use the parole violation "as a tool to keep him there," the fact that Drake had told Pondakos of the narcotics violation is a factor bearing on Drake's state of mind at the time he gave the statement.
The station-house setting of an interrogation does not automatically transform an otherwise noncustodial interrogation into a custodial interrogation. Mathiason. Yet, an interrogation at a station house at the request of the police is inherently more coercive than an interrogation in another less suggestive setting, and it is a factor that should be considered in evaluating the totality of the circumstances of a given case. We find that, under the circumstances as they existed at the time Drake submitted to the taped questioning, a reasonable person would have believed that his freedom of action was restricted in a significant way.[2] Especially persuasive is the fact that Drake's request to discontinue further interrogation without his attorney went unheeded. Such a turn of events would certainly give a reasonable person a sense of confinement.
The burden of proving the voluntariness of a statement is on the state. State v. Chorpenning, 294 So.2d 54 (Fla. 2d DCA 1974). There is no factual basis to support the state's argument that Drake's statement was voluntary. Once Drake had expressed his desire to have counsel, the only permissible additional inquiry would be to clarify an equivocal request. Nash v. *1082 Estelle, 597 F.2d 513 (5th Cir.), cert. denied, 444 U.S. 981, 100 S.Ct. 485, 62 L.Ed.2d 409 (1979). Drake's request was unequivocal, and Edwards applies to prohibit further police-initiated interrogation before furnishing counsel. Instead, the police misled Drake into submitting to additional interrogation by the promise that no new ground would be covered. This arrangement was impermissible reinterrogation under Edwards, since Drake had clearly asserted his right to counsel. When the detective did not receive the hoped-for inculpatory response, he took the position, and testified before the jury, that Drake's pause meant that he was thinking about what item was left at the scene of the crime. We find such a conclusion unwarranted and unduly suggestive. The taped interrogation was involuntary and its introduction was extremely prejudicial to the defendant's case in light of the fact that the prosecutor used the interrogation to argue before the jury that Drake's pause was an indication that Drake was lying. As we have said before, "[w]hen the error affects a constitutional right of the defendant, the reviewing court may not find it harmless `if there is a reasonable possibility that the error may have contributed to the accused's conviction or if the error may not be found harmless beyond a reasonable doubt.'" Palmes v. State, 397 So.2d 648, 654 (Fla.), cert. denied, 454 U.S. 882, 102 S.Ct. 369, 70 L.Ed.2d 195 (1981) (quoting Nowlin v. State, 346 So.2d 1020, 1024 (Fla. 1977)). Such error may be treated as harmless where there is overwhelming evidence of guilt. Jones v. State, 332 So.2d 615, 619 (Fla. 1976). The circumstantial evidence in the present case is less than overwhelming. We find therefore that another trial is the only way the defect can be cured.[3]
We hereby reverse Drake's first-degree murder conviction and remand to the circuit court for a new trial, thereby making unnecessary a ruling on Drake's other points on appeal.
We note that the trial court permitted the jury to hear that Drake was on parole, and that a witness answered in the affirmative as to his knowledge of the nature of the crime for which Drake was on parole. The witness expressed his "concern [therefore] for the safety of the victim in this case." While relevant evidence should not be excluded merely because it points to the commission of a separate crime, Williams v. State, 143 So.2d 484 (Fla. 1962), it must be relevant to a material issue other than propensity or bad character. In our prior reversal of Drake's conviction, we found the evidence of previous crimes irrelevant to show either identity or motive. The state again argues motive and also that this evidence was relevant to show that Reeder, who knew Drake was a parolee, would not voluntarily accompany him in his car alone and therefore must have been kidnapped.[4] We also fail to find this latter theory of relevance persuasive. That Reeder knew Drake was on parole has no logical or legal relevance as to whether she would get in the car, particularly since she had voluntarily accompanied him into the parking lot with knowledge of his parole status.
In the event Drake is reconvicted, we make two additional observations about the aggravating circumstances. Paragraph 4 of the trial court's findings of fact and conclusions of law reflects impermissible consideration of a nonstatutory aggravating factor:
4. The crime for which the Defendant is sentenced was without regard to human feeling by dumping in a rural area, disrobed, with the weather elements and animals to further act upon the body.
Only statutory aggravating factors may be considered. Miller v. State, 373 So.2d 882 (Fla. 1979). In addition there is insufficient basis in the present record for the paragraph 5 finding that the crime was committed in a cold, calculated, and premeditated *1083 manner so as to fall within the purview of section 921.141(5)(i), Florida Statutes (1981). See Mann v. State, 420 So.2d 578 (Fla. 1982); Jent v. State, 408 So.2d 1024 (Fla. 1981), cert. denied, 457 U.S. 1111, 102 S.Ct. 2916, 73 L.Ed.2d 1322 (1982).
Reversed and remanded to the circuit court for a new trial in accordance with this opinion.
It is so ordered.
ALDERMAN, C.J., and BOYD, OVERTON, McDONALD, EHRLICH and SHAW, JJ., concur.
ADKINS, J., dissents.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).
[2] "In determining `custody,' the majority of courts have utilized an objective test ... whether, under the circumstances, a reasonable person would have believed he was in custody." Williams v. State, 403 So.2d 453, 455 (Fla. 1st DCA 1981) (citations omitted). We adopt this approach of the First District Court of Appeal.
[3] We do recognize, however, that Drake's statements made prior to his request for an attorney are admissible.
[4] The jury was given instructions on premeditated murder and felony murder, with kidnapping as the underlying felony.