548 So.2d 198 (1989)
Charlie THOMPSON, Appellant,
v.
STATE of Florida, Appellee.
No. 70401.
Supreme Court of Florida.
July 20, 1989.
Rehearing Denied September 28, 1989.
*199 James Marion Moorman, Public Defender, and Stephen Krosschell, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., and Davis G. Anderson, Jr., Asst. Atty. Gen., Tampa, for appellee.
PER CURIAM.
Charlie Thompson appeals his conviction and sentence of death. We have jurisdiction. Art. V, § 3(b)(1), Fla. Const. We reverse and remand for new trial.
Charlie Thompson was grounds keeper and gravedigger for the Myrtle Hill Cemetery in Tampa. In May 1986, he pulled a muscle digging a grave and filed a worker's compensation claim. Apparently he never received a final $150 check on the claim and called Myrtle Hill's treasurer and bookkeeper, William Swack, about the missing check. Swack told him to come to the cemetery the next day.
On August 27, Thompson arrived at the cemetery and confronted Swack and an assistant, Nancy Walker. At that time, Swack mistakenly wrote Thompson a check, not for $150, but for $1500. For reasons not clear in the record, a fight erupted. Thompson contended in a taped statement that Walker slapped him, he pulled a gun, and forced Swack to drive him and Walker to a nearby park.
*200 At the park, Swack supposedly hit Thompson with a tree branch and, in return, Thompson slapped Swack on the neck. Thompson then made both Swack and Walker strip to their underclothes, but later he permitted Walker to put her clothes back on. There was no allegation of sexual battery. Finally, Thompson shot Swack and then Walker.
On the afternoon of August 27, 1986, a passerby found the bodies of Swack and Walker in the woods at the park. Swack had been stabbed several times and then shot, and Walker had died of a bullet wound to the back of the head. Police arrived and prepared the evidence. They noted that Swack was dressed only in underwear, shoes and socks. A pair of trousers lay next to the body, and a shirt covered the face. Evidence indicated that a watch and other jewelry may have been removed from Swack's body. Walker was entirely clothed.
Later, police learned that Thompson had sold a watch and ring to a man and a woman on August 28, 1986. Between August 27 and 29, 1986, Thompson also attempted unsuccessfully to cash the $1500 check at various businesses. Police arrested him on August 29, 1986, at a used car lot.
After a jury trial, Thompson was found guilty and the jury then returned an advisory verdict of nine to three in favor of death. The court concurred and imposed the death sentence.
On this appeal, Thompson raises eighteen issues. We confine our review to two issues dispositive of the case.
Despite repeated objections by defense counsel at trial, the prosecutor used his peremptory challenges to excuse all eight blacks sitting on the initial panel at voir dire.[1] Thompson now argues that at least four of those challenges were exercised contrary to our holding in State v. Neil, 457 So.2d 481 (Fla. 1984), clarified, State v. Castillo, 486 So.2d 565 (Fla. 1986), and clarified, State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, ___ U.S. ___, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988).
As we explained in Slappy,
the appearance of discrimination in court procedure is especially reprehensible, since it is the complete antithesis of the court's reason for being  to insure equality of treatment and evenhanded justice.
Slappy, 522 So.2d at 20. Based on this principle, in Slappy we expressly reaffirmed that test established in Neil. Under that test, parties alleging that group bias[2] is the reason for the excusal of any distinct class of persons from a venire must (a) make a timely objection, (b) demonstrate on the record that the challenged persons are members of that group, and (c) show that there is a strong likelihood these persons have been challenged because of impermissible bias. Neil, 457 So.2d at 486.
In Slappy, we extended the principles of Neil by holding that "broad leeway" must be accorded to the objecting party, and that any doubts as to the existence of a "likelihood" of impermissible bias must be resolved in the objecting party's favor. Slappy, 522 So.2d at 21-22. Whenever this burden of persuasion has been met, the burden of proof then rests upon the state to demonstrate "that the proffered reasons are, first, neutral and reasonable and, second, not a pretext." Id. at 22. Thus, in Slappy we expressly found that the state's use of four of its six peremptory challenges to exclude blacks who had indicated no partiality was sufficient of itself to shift the burden of proof to the state. Id. at 23.
The record before us contains several exchanges regarding the excusal of blacks. *201 When the state first excused a black peremptorily, the trial court denied the defense's Neil motion without requiring any explanation from the state. The following exchange then occurred:
THE COURT: ... There's been no showing of any systematic preemptorily [sic] challenging of blacks on this jury, and the Court recalls that [the black juror] Mr. Brooks said that he was arrested and charged a couple of months ago, and although he said that wouldn't affect him 
MR. ALLDREDGE: Wait a second, Judge.
THE COURT: I'm saying that the State does not have to give its reasons for exercising a preemptory [sic] challenge. I'm saying that, as the Court, I heard that and I'm not going to force the State to state its reasons for exercising a preemptory [sic] challenge at this stage.
There's been no showing that the State is systematically striking blacks.
As in this instance, the trial court refused to require the state to give any explanation for the excusal of the next several blacks it peremptorily challenged. However, when the state challenged Juror Bell, the following exchange occurred between the trial judge and prosecutor Benito:
THE COURT: If the Court had heard Mr. Bell vascillate [sic] as to any particular matter in this case, I may recognize that the State has the right to exercise a preemptory [sic] challenge.
But when Mr. Bell says that he knows two of the State witnesses and has not shown any reason for being prejudice [sic] for or against the State or for or against the defense, and we are about to run out of all black persons in this panel, I will force the State to explain, on the record, why you are exercising a preemptory [sic] challenge ...
... .
MR. BENITO: First of all, I don't have to make a showing unless the Court is finding there is a systematic exclusion of blacks.
THE COURT: I've so found.

(Emphasis added.) The prosecutor, however, continued to challenge the judge's finding:
MR. BENITO: ... That's not what the Neal [sic] case says. The Neal [sic] case says if I start systematically excluding blacks from the jury panel, you got [sic] to make a finding of that, and I've got to explain my reasons for doing that. There's a black seated on the jury.
How can I be systematically excluding blacks when you got a black sitting on the jury after I excuse Mr. Bell?
THE COURT: Is there any case to that effect, Mr. Benito, other than, as you say, common sense shows you're not systematically because there's one left?
MR. BENITO: Certainly.
... .
THE COURT: The Court finds that the State is not systematically excluding blacks from this jury. State has exercised a preemptory [sic] challenge as to Mr. Bell.
(Emphasis added.) The trial court then permitted the state to continue exercising peremptory challenges against black jurors without explanation. However, when the state attempted to strike Juror Tyler, defense counsel Alldredge objected and the following exchange occurred:
MR. ALLDREDGE: The objection is that you are systematically excluding blacks from the jury.
THE COURT: The Court so finds unless you have valid, cogent reasons for excusing Mr. Tyler in this case.
... .
MR. BENITO: Tyler has been in jail. I'm very uncomfortable even though he said he could try to be fair and impartial. I think I have a right to exercise a preemptory [sic] challenge regarding Mr. Tyler having been in jail at one time back in the '50's, when my recollection and my school work in college was they were hanging black people back then for spitting on the sidewalk. So this man's view of law enforcement regarding what's happened to him in the past and going to jail, I think may taint his *202 ability to be fair to the State in this particular case.
(Emphasis added.) As the state continued to exercise its peremptory to strike blacks, it then offered explanations for each.[3] However, at no time did the state give, or the trial court require, reasons for the excusal of Juror Brooks.
The record reflects that the trial court below clearly entertained serious doubts at to whether the state was improperly exercising its peremptory challenges. Accordingly, the court should have resolved this doubt in favor of the defense and conducted an inquiry as to the state's reasons for all the challenged excusals. Slappy, 522 So.2d at 21-22. These reasons must be supplied by the prosecutor. Here, the trial court conducted an improper inquiry because it failed to question the state as to each and every peremptory challenge exercised against blacks once it became clear that the state might be improperly exercising its peremptory challenges. For this reason alone, we must reverse.
Moreover, the entire course of voir dire recounted here reflects a serious misunderstanding of our holdings in Neil and Slappy, as well as the related federal case law. In Slappy we found
the number [of challenged peremptories] alone is not dispositive, nor even the fact that a member of the minority in question has been seated as a juror or alternate. Indeed, the issue is not whether several jurors have been excused because of their race, but whether any juror has been so excused, independent of any other.
Slappy, 522 So.2d at 21 (citations omitted). Accord United States v. David, 803 F.2d 1567, 1571 (11th Cir.1986); Fleming v. Kemp, 794 F.2d 1478 (11th Cir.1986). The present record reflects a grave possibility that the trial court below relied upon the state's erroneous statement that Neil only comes into play if there is a "systematic" exclusion of blacks.[4] This is the only reasonable conclusion based on the record. Indeed, the trial court first began to conduct a Neil inquiry but then reversed itself after hearing the state's erroneous statement of the law. Moreover, every relevant statement by the trial court incorrectly characterized Neil as applying only to "systematic" uses of the peremptory.
Finally, we note that the reasons given by the state for challenging Juror Tyler did not meet the standard set in Slappy. The state asserted that it excused Tyler because he had been in jail in the 1950s when "they were hanging black people ... for spitting on the sidewalk." While in some circumstances the state might validly challenge a person based on prior incarceration, the phrasing of the answer by the prosecutor here indicates that the state was as much concerned with Juror Tyler's race as with the prior incarceration. This is not permissible. The unsupported speculation that Tyler somehow harbored secret prejudice because of the general circumstances of blacks in the 1950s is not the kind of racially "neutral explanation" required by Slappy. 522 So.2d at 22.
Next, appellant asserts constitutional error based on the admission of his confession. During interrogations, police persuaded Thompson to submit to a "test." Turning down the lights and putting on goggles, police informed Thompson that a laser light directed at his arms would make them glow in the dark if he recently had fired a weapon. They did not tell Thompson that this "test" also reveals the presence of many other common chemicals and substances. Putting on goggles and turning down the lights, police shone the laser on Thompson's arms, producing a glow. Within minutes, Thompson made incriminating statements to the police.
*203 Also during these interrogations, the following relevant exchange between police and Thompson occurred:
DETECTIVE CHILDERS: Did you understand your rights?
THE DEFENDANT: Yeah.
DETECTIVE CHILDERS: Did you at any time request an attorney?

THE DEFENDANT: Yeah, but I don't have the money to pay an attorney.

DETECTIVE CHILDERS: You never told us that you wanted an attorney, did you?
THE DEFENDANT: No.
DETECTIVE CHILDERS: Okay. What you're saying right now is because Charlie Thompson wants to say it, isn't that correct?
THE DEFENDANT: Yes.
(Emphasis added.) Thompson had given portions of his confession both before and after the statement quoted here. Thus, two subissues are raised.
First, Thompson argues that the statement quoted above was an equivocal request for counsel and that police failed to comply with Long v. State, 517 So.2d 664, 666-67 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 1754, 100 L.Ed.2d 216 (1988). There, we clarified the standard governing police interrogations after an equivocal request for counsel. We first noted in Long that Miranda v. Arizona, 384 U.S. 436, 444-45, 86 S.Ct. 1602, 1612-13, 16 L.Ed.2d 694 (1966), required police questioning to stop if the accused indicated "in any manner and at any stage of the process that he wishes to consult with an attorney before speaking." Then we cited Edwards v. Arizona, 451 U.S. 477, 484, 101 S.Ct. 1880, 1884, 68 L.Ed.2d 378 (1981), which held that an accused who has invoked his right to counsel does not waive that right merely by responding to further police-initiated interrogation. Based on these principles, we concluded that an equivocal request for counsel by the accused permits police "to continue questioning for the sole purpose of clarifying the equivocal request," but nothing more. 517 So.2d at 667.
In the present case, we believe the Long error is clear on the face of the record. At the time Thompson made his equivocal request, police should have ceased all questioning until they had clarified the meaning of Thompson's statement. Long. Accordingly, those portions of the confession occurring after the equivocal request for counsel must be suppressed on remand.
The second subissue deals with those portions of the confession occurring prior to Thompson's equivocal request for counsel. In support of this argument, Thompson primarily rests his argument on evidence of mental subnormality contained in the record as well as on police "trickery" in using the laser. This subnormality, he argues, renders his entire confession nonvoluntary and inadmissible.
The fact of mental subnormality or impairment alone does not render a confession involuntary, Ross v. State, 386 So.2d 1191 (Fla. 1980), except in those rare cases involving subnormality or impairment so severe as to render the defendant unable to communicate intelligibly or understand the meaning of Miranda warnings even when presented in simplified form. Cooper v. Griffin, 455 F.2d 1142 (5th Cir.1972).
A number of courts have considered this problem in analogous situations in which the Miranda warnings may have been misunderstood by a mentally retarded or otherwise impaired defendant. The United States Supreme Court, for instance, has held that permanent or temporary mental subnormality is a factor that must be considered in the totality of the circumstances to determine the voluntariness of a confession. Sims v. Georgia, 389 U.S. 404, 88 S.Ct. 523, 19 L.Ed.2d 634 (1967) (confession suppressed when defendant who was illiterate, with third-grade education and "decidedly limited" intellectual abilities, had been interrogated for eight hours). Accord Townsend v. Sain, 372 U.S. 293, 83 S.Ct. 745, 9 L.Ed.2d 770 (1963) (pre-Miranda case in which confession was suppressed when drug-addicted defendant had been administered a medication that had properties of "truth serum"). This is in *204 keeping with the "totality of the circumstances" test used in cases involving the alleged waiver of constitutional rights. North Carolina v. Butler, 441 U.S. 369, 99 S.Ct. 1755, 60 L.Ed.2d 286 (1979); Henry v. Dees, 658 F.2d 406 (5th Cir.1981).
It appears that a majority of American jurisdictions expressly adhere to the totality of the circumstances approach. See Annotation, Mental Subnormality of Accused as Affecting Voluntariness or Admissibility of Confession, 8 A.L.R.4th 16, 24-28 (1981) & 3-4 (Supp. 1988) (citing cases). This includes Florida. Kight v. State, 512 So.2d 922 (Fla. 1987), cert. denied, ___ U.S. ___, 108 S.Ct. 1100, 99 L.Ed.2d 262 (1988); Ross; Myles v. State, 399 So.2d 481 (Fla. 3d DCA 1981).
The question of voluntariness is, in the first instance, a question to be determined by state law, subject to the minimum requirements of the fourteenth amendment's due process clause. Jackson v. Denno, 378 U.S. 368, 393, 84 S.Ct. 1774, 1789, 12 L.Ed.2d 908 (1964). While the United States Supreme Court has not explicitly provided a standard for determining voluntariness, see Martens, The Standard of Proof for Preliminary Questions of Fact under the Fourth and Fifth Amendments, 30 Ariz.L.Rev. 119, 119 (1988), other federal courts have held that
[i]n considering the voluntariness of a confession, this court must take into account a defendant's mental limitations, to determine whether through susceptibility to surrounding pressures or inability to comprehend the circumstances, the confession was not a product of his own free will.
Jurek v. Estelle, 623 F.2d 929, 937 (5th Cir.1980), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981). One of the central concerns in this inquiry is "a mentally deficient accused's vulnerability to suggestion." Henry, 658 F.2d at 409.
We agree with this assessment. Florida case law holds that mental weakness of the accused is a factor in the determination, and that the courts also should consider
comprehension of the rights described to him, ... a full awareness of the nature of the rights being abandoned and the consequences of the abandonment.
Kight, 512 So.2d at 926. See art. I, § 9, Fla. Const. To this end, the burden is on the state to show by a preponderance of the evidence that the confession was freely and voluntarily given and that the rights of the accused were knowingly and intelligently waived.[5]Henry, 658 F.2d at 409; Ross, 386 So.2d at 1194. Accord Doerr v. State, 383 So.2d 905 (Fla. 1980); Fields v. State, 402 So.2d 46 (Fla. 1st DCA 1981).
Accordingly, we must consider Thompson's claims of subnormality in light of all the evidence in the record.
We find that there was other substantial evidence suggesting that this subnormality was not so severe as to render his entire exchange with the police inadmissible. Indeed, some evidence shows that Thompson was capable of understanding his Miranda rights. For instance, Detective Childers testified that during the initial interview Thompson talked with police for more than two hours without having difficulty understanding the questions. The trial court was entitled to weigh the credibility of this testimony against that of Thompson. Thompson also attempted to provide an alibi during this period of time, suggesting that he realized he was in trouble and appreciated the consequences of his conversations with the police. We thus must conclude that sufficient evidence exists on this record to support the trial court's decision to allow into evidence that portion of the confession occurring prior to Thompson's equivocal request for counsel.
*205 We reverse and remand for new trial on all issues.
It is so ordered.
EHRLICH, C.J., and OVERTON, SHAW and GRIMES, JJ., concur.
McDONALD, J., concurs specially with an opinion.
BARKETT, J., concurs in part and dissents in part with an opinion, in which KOGAN, J., concurs.
McDONALD, Justice, concurring specially.
I concur because of the majority opinion in State v. Slappy, 522 So.2d 18 (Fla.), cert. denied, ___ U.S. ___, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988). I do not agree with all of Slappy because it was overly restrictive in allowing a trial judge to decide whether the peremptories were being made on a racially neutral basis. Under any reasonable test, however, an insufficient inquiry and finding were made in this case. I fully concur with the discussion of the confession issue.
BARKETT, Justice, concurring in part, dissenting in part.
While I concur on the Slappy and Long issues, I would order the entire confession suppressed. The degree of this defendant's mental subnormality combined with the police use of the unreliable laser "test" casts grave doubts on the voluntariness of the confession. I would resolve those doubts in favor of the accused.
KOGAN, J., concurs.
NOTES
[1] From a subsequent panel, the prosecutor permitted a single black to sit on the jury and offered to seat others that the state "approved." However, this fact standing alone is not sufficient to insulate the state from a challenge under State v. Neil, 457 So.2d 481 (Fla. 1984), when the peremptory has been exercised improperly in the case of other jurors. State v. Slappy, 522 So.2d 18, 21 (Fla.), cert. denied, ___ U.S. ___, 108 S.Ct. 2873, 101 L.Ed.2d 909 (1988).
[2] As we have noted in Kibler v. State, 546 So.2d 710 (Fla. 1989), Neil applies equally to any use of the peremptory because of "group bias." At 712.
[3] We need not concern ourselves with these explanations, since we decide this case based on the first series of peremptories exercised by the state.
[4] The term "systematic" is derived from Swain v. Alabama, 380 U.S. 202, 85 S.Ct. 824, 13 L.Ed.2d 759 (1965), a decision that was rejected on state-law grounds by the Court in Neil and overruled by the United States Supreme Court in Batson v. Kentucky, 476 U.S. 79, 106 S.Ct. 1712, 90 L.Ed.2d 69 (1986). Under Neil and Slappy, there is no requirement that the improper use of the peremptory be "systematic."
[5] The trial court's conclusion on this question will not be upset on appeal unless clearly erroneous; however, the clearly erroneous standard does not apply with full force in those instances in which the determination turns in whole or in part, not upon live testimony, but on the meaning of transcripts, depositions or other documents reviewed by the trial court, which are presented in essentially the same form to the appellate court. Jurek v. Estelle, 623 F.2d 929, 932 (5th Cir.1980), cert. denied, 450 U.S. 1001, 101 S.Ct. 1709, 68 L.Ed.2d 203 (1981).