651 So.2d 108 (1995)
Christopher Laron SNIPES, Appellant,
v.
STATE of Florida, Appellee.
No. 93-03860.
District Court of Appeal of Florida, Second District.
February 1, 1995.
James Marion Moorman, Public Defender, and John S. Lynch, Asst. Public Defender, Bartow, for appellant.
Robert A. Butterworth, Atty. Gen., Tallahassee, and Susan D. Dunlevy, Asst. Atty. Gen., Tampa, for appellee.
RYDER, Acting Chief Judge.
Christopher Laron Snipes, a minor, attacks the trial court's final judgment adjudicating him guilty of manslaughter with a firearm. He presents four grounds for reversal, but because we agree that the trial court committed reversible error in its refusal to suppress the statements made by appellant during interrogation, we need not address the other issues.
The testimony given at the suppression hearing revealed the following. Polk County Sheriff's Deputy Price, a homicide detective, testified that he was assigned to investigate the death of Antwan Parker whose body was discovered in a grove. A citizen reported that he had seen the decedent enter the grove with a juvenile. The detective's inquiries led him to Snipes and his home. When Price arrived at the house, Snipes's mother was present and produced him for the detective. *109 Det. Price believed the appellant to be fifteen at the time. Price testified he did not advise him of his Miranda[1] rights despite the fact that Price suspected that Snipes was involved in the homicide from the beginning. Snipes gave Price an alibi.
When Snipes's alibi witnesses did not support the alibi, Price returned to the Snipes's residence to confront the appellant at about 11:45 p.m. that same night. Price first told Mrs. Snipes that the stories were inconsistent. She then awakened her son. Again, without advising Snipes of Miranda, Price further questioned Snipes who then advised Price that he had acquired a.357 Magnum pistol and that while shooting it, a bullet apparently ricocheted off a tree limb and struck Parker. Snipes said he then threw the gun away in nearby bushes. Det. Price told Snipes and his mother that he wanted to take Snipes to the scene to retrieve the gun in order to prevent injury to anyone else. Mrs. Snipes allowed the detective to take Snipes to the grove the next morning.
Snipes accompanied Price to the grove the next morning around 10:00 a.m., because he thought he had to. There, Detectives Price and Henry asked Snipes to reenact the incident. Snipes showed them where he had stood and complied with their request. He claimed that Parker had stumbled and been shot in the back. After waiting at home a few hours, Mrs. Snipes became concerned about her son and joined the officers and Snipes at the grove. This was probably after lunch.
At the grove early that afternoon, Detective Price received the autopsy results which indicated there were two wounds to Parker's body; one wound to the front of the body and a second wound with pellets to the back of the skull. When the detectives confronted Snipes with this information, he explained that there was a different type of projectile used in the gun. He further stated the ricocheting bullet hit Parker first, then Snipes stumbled from the recoil and the gun discharged again, hitting Parker in the back of the head.
Because of the inconsistencies, the detective proposed that Snipes be polygraphed. Snipes and his mother consented to the polygraph. Detective Price advised Snipes and his mother that he would transport Snipes to Bartow for the polygraph and return him home afterwards. Mrs. Snipes offered to take him to Bartow, but Price placed his hands on Snipes's shoulders and, again, said that he would take him. Mrs. Snipes testified that her son's trip to Bartow with them was against her wishes. Although Detective Price testified that the appellant was free to leave, he did not so advise him because Snipes did not ask to leave. They left the grove around 4:00 p.m. and when they reached the sheriff's Bartow homicide office, Mrs. Snipes was not allowed to observe her son's questioning. However, she signed a polygraph permission form.
The polygraph machine operator warned the appellant that he had already made changes in his story. Polygraphing was discontinued after five or six minutes during the preinterview because Snipes changed his description of the type weapon involved in the incident from a pistol to a rifle. The polygrapher claimed he was unable to complete the exam due to the inconsistencies.
Snipes testified that the deputies asked him why he was changing his story. Three to four officers were involved in the interrogation and investigation. Snipes alleges that many times he wanted to stop talking to them, but he thought he had to talk to them as they told him repeatedly to talk to them.
After an unknown period of time, Mrs. Snipes asked the deputies why the interrogation was taking so long and why her son could not leave. Detective Price advised her that they would have to conduct an additional interview before they could set up further polygraph questioning. The parties exchanged expletives when Price told Mrs. Snipes they were not through yet. She was told that she could either wait or leave. She departed the premises but left telephone numbers where she could be reached.
Detective Ore could not relate any discussion regarding the question whether Snipes *110 was free to leave, but he felt he was. However, Snipes was clearly the focus of the investigation according to Ore and he "seemed scared about something." Ore explained it was because Snipes was lying about the pistol or being scared to tell the truth.
Detective Price interviewed the appellant again around 5:45 p.m. after the polygrapher had left. Snipes then related to the detectives his attempts to force nonstandard ammunition in an over-and-under rifle. He said he accidentally shot Parker in the back while shooting at a low flying bird, but he could not account for the second gunshot wound. Then, he changed his statement and said that when the gun recoiled, he stumbled, and a second discharge hit Parker. The officers challenged him, contending that the pattern of the pellets would have been more spread out than they were found to be. At that juncture, the officers walked out of the room. Det. Price still contended that Snipes was free to leave, and that the conversations up to that point were calm and low key.
Snipes testified that the detectives cut him off and became angry. After 6:50 p.m., the investigators returned to continue the questioning. Snipes then told them that there had actually been a rifle and a shotgun. He stated again that the first shot was accidental and that Parker fell over on the shotgun he was carrying. Parker's finger was on the trigger and the barrel was pointed at his head when the gun accidentally discharged into the back of his head. The deputies showed Snipes how this scenario was physically impossible. Det. Ore became frustrated with appellant and left the room.
Later, Mrs. Snipes telephoned and stated that she wished to obtain a lawyer for her son. Price told her it was too late and that she would have to wait until Monday. Price denied Mrs. Snipes mentioned retaining an attorney. Mrs. Snipes indicated she did not want them to talk to her son any longer and wanted him brought back home within the next ten minutes. She demanded and was allowed to speak with her son. Mrs. Snipes's demands triggered a telephone communication between the sheriff and the state attorney's office.
Det. Price told Snipes that his mother wanted him to be returned home. According to Price, Snipes then responded that he wanted to get it over with and tell the truth. Price stated he had asked Snipes what he wanted to do at least once after Snipes told the officers that his mother did not want him to talk to the police. However, Snipes said he was tired and scared so he told them what they wanted to hear. He did not feel that he was free to go and had no way to get home. Price testified that Snipes said that Parker was accidentally shot in the back by him while he shot at a bird. Parker fell to his knees, cursing, and said that he would tell on him. Frightened that he would go to jail, Snipes picked up the shotgun and shot him in the back of the head. This statement was made at 7:50 p.m. Det. Price attempted unsuccessfully to reach Mrs. Snipes to tell her that her son wanted to make a statement and that he would not be brought home in the next ten minutes. The detectives wanted to reinterview him before arresting him. Det. Ore testified that Snipes told another story, that is, that he and Parker struggled over who would get to shoot the shotgun, it accidentally discharged; when Parker screamed and threatened Snipes, he shot him in the back of the head to silence him. Snipes was then arrested.
Snipes's counselor at the Dept. of Health and Rehabilitative Services testified that appellant is emotionally handicapped, but that he does not equate this with being mentally handicapped.
The trial court found that the appellant had been free to leave during the interrogations. The court granted the motion to suppress as to statements made after the appellant first said the second shot was intentional, but denied it as to that and previous statements.
The burden is on the state to show by a preponderance of the evidence that the confession was freely and voluntarily given and that the rights of the accused were knowingly and intelligently waived. Thompson v. State, 548 So.2d 198, 204 (Fla. 1989). To be admissible, a confession must be voluntary and not obtained in violation of a defendant's *111 Miranda rights. See State v. Sawyer, 561 So.2d 278 (Fla. 2d DCA 1990). The test of voluntariness is determined by an examination of the totality of the circumstances surrounding the confession. Traylor v. State, 596 So.2d 957, 964 (Fla. 1992); Rimpel v. State, 607 So.2d 502 (Fla. 3d DCA 1992), review denied, 614 So.2d 503 (Fla. 1993); Sawyer. The "totality of the circumstances" may include police conduct and interrogation techniques used by the police, Sawyer; the duration and nature of the questioning, Thompson; whether the interview occurred at a police station in police-controlled areas, see Drake v. State, 441 So.2d 1079, 1081 (Fla. 1983), cert. denied, 466 U.S. 978, 104 S.Ct. 2361, 80 L.Ed.2d 832 (1984); that the defendant was not told that he was free to leave during the proceedings regardless of the officer's subjective intent, see B.S. v. State, 548 So.2d 838 (Fla. 3d DCA 1989); the vulnerability of a juvenile to the wishes of adult authority figures, B.S.; the emotional maturity or mental weakness of a child, Thompson; isolation from others who might lend moral support or advice, U.S. v. Carter, 884 F.2d 368 (8th Cir.1989); Rimpel; whether the defendant contacted the police or vice versa, Orozco v. Texas, 394 U.S. 324, 89 S.Ct. 1095, 22 L.Ed.2d 311 (1969); Drake.
"Miranda warnings are only required when a person is in custody, engaged in an `inherently coercive custodial interrogation.'" Caso v. State, 524 So.2d 422, 423 (Fla.), cert. denied, 488 U.S. 870, 109 S.Ct. 178, 102 L.Ed.2d 147 (1988). Numerous factors are considered together to determine whether an interrogation is custodial. Whether the interrogation occurred at the police station in police-controlled areas can point to a custodial setting. See Drake.
Applying the law to the facts presented in this case, we conclude that Snipes's statements elicited after the failed polygraph attempt followed by his mother's demand that he be returned home were involuntarily given and should have been suppressed. Mr. Snipes was picked up by Det. Price at about 10:00 a.m. and his arrest occurred at about 8:30 p.m. Mrs. Snipes gave permission for him to go to the grove and then to the sheriff's office for a polygraph examination, but Snipes was never advised during the entire day and into the night that he was free to leave. Although Mr. Snipes is not mentally retarded, there was evidence that he is emotionally impaired. The officers stated that he was the focus of the investigation. As a juvenile, he was vulnerable to the requests of adult authority figures, especially here where at least three detectives took turns interrogating him during the extended period of time. The deputies limited Snipes's contact with his mother. He was not allowed to travel with her to the sheriff's office. Snipes was isolated from his mother, in fact she was required to be in another area of the station during the interrogation or was informed she could return to her home. Finally, she was advised that the deputies were not "through" with him and that she was prohibited to return to the area where the interrogation was taking place. She spoke with him once around 6:50 p.m., but, apparently, he had already decided to give a statement to the deputies. At no time was the juvenile ever given his legal rights required by Miranda.
We distinguish the Rimpel decision on its facts where the fifteen-year-old defendant's confession during a nine-hour interview was found to have been freely and voluntarily given because he was informed of and signed a waiver of his constitutional rights, was not denied access to his attorney or his parents and he was questioned by one officer.
After thoroughly reviewing the record, we must conclude that the appellant's statements were not voluntary after his mother demanded his return and that the interrogation cease. Accordingly, we reverse the trial court's denial of the suppression motion and remand for further proceedings consistent with this opinion.
Reversed and remanded.
PARKER and LAZZARA, JJ., concur.
NOTES
[1] Miranda v. Arizona, 384 U.S. 436, 86 S.Ct. 1602, 16 L.Ed.2d 694 (1966).