742 So.2d 536 (1999)
T.S.D., a juvenile, Appellant,
v.
The STATE of Florida, Appellee.
No. 98-2692.
District Court of Appeal of Florida, Third District.
October 27, 1999.
Bennett H. Brummer, Public Defender, and Amy D. Ronner, Special Assistant Public Defender, and Evelina Libkhen and Robin Lea, Certified Legal Interns, for appellant.
Robert A. Butterworth, Attorney General, and Richard L. Polin, Assistant Attorney General, and Nicole E. Hawks, Certified Legal Intern, for appellee.
Before GERSTEN, FLETCHER and SHEVIN, JJ.
For majority opinion of the court, see 741 So.2d 1142.

ON MOTION FOR REHEARING
PER CURIAM.
The motion for rehearing is denied.
Before NESBITT, JORGENSON, COPE, GERSTEN, GODERICH, GREEN, FLETCHER, SHEVIN and SORONDO, JJ.[*]

ON MOTION FOR REHEARING EN BANC
PER CURIAM.
The motion for rehearing en banc is denied.
NESBITT, GERSTEN, GODERICH, GREEN, FLETCHER and SHEVIN, JJ., concur.
SORONDO, J. (dissenting)
I respectfully dissent from this Court's denial of rehearing en banc. The issue in this case involves, once again, the standard of review. In Thompson v. State, 548 So.2d 198, 204 (Fla.1989), the Florida Supreme Court stated that in a motion to suppress a confession:
[T]he burden is on the state to show by a preponderance of the evidence that the confession was freely and voluntarily given and that the rights of the accused were knowingly and intelligently waived.
The Court added a footnote:

The trial court's conclusion on this question will not be upset on appeal unless clearly erroneous; however, the clearly erroneous standard does not apply with full force in those instances in which the determination turns in whole or in part, not upon live testimony, but on the meaning of transcripts, depositions or other documents reviewed by the trial court, which are presented in essentially the same form to the appellate court.
Id. at 204 n. 5 (emphasis added). Additionally, appellate courts must interpret the evidence and reasonable inferences in the light most favorable to sustaining the trial court's conclusions. See Cole v. State, 701 So.2d 845, 855 (Fla.1997), cert. denied, 523 U.S. 1051, 118 S.Ct. 1370, 140 L.Ed.2d 519 (1998); Carter v. State, 697 So.2d 529, 532 (Fla. 1st DCA 1997); State v. Wright, 662 So.2d 975, 976 (Fla. 2d DCA 1995); State v. Reed, 421 So.2d 754 (Fla. 4th DCA 1982). Reversal is warranted only where there is no basis in the record for sustaining the ruling even after affording the trial court the presumption of correctness. See Wright, 662 So.2d at 976.
Because the trial judge heard live testimony in this case the standard of review is the "clearly erroneous" standard. The panel opinion, however, concludes simply that "the state did not `meet its burden of demonstrating by a preponderance of the *537 evidence that ... [T.S.D.] knowingly and intelligently waived his right to remain silent and his right to counsel.'" T.S.D. v. State, 741 So.2d 1142, 24 Fla. L. Weekly D1149 (Fla. 3d DCA 1999). This conclusion reeks of de novo review. Indeed, the opinion specifically says: "Here, the evidence shows that T.S.D. did not possess the ability to comprehend the rights he was waiving. Upon considering, not only T.S.D.'s age, but `a combination of that factor [and] such other circumstances as his intelligence, education, experience, and the ability to comprehend the meaning and effect of his statement,' it becomes clear that T.S.D.'s confession was not admissible." Id. In other words, the panel has read the record and accepted the respondent's version of events, contrary to the conclusion reached by the trial judge. Given the record in this case I do not believe the respondent has established that the trial judge's decision was clearly erroneous. A review of the facts is necessary.

FACTS
Counsel for the twelve-year-old T.S.D. filed an amended motion to suppress T.S.D.'s confession, asserting in pertinent part that T.S.D. was incapable of knowingly and intelligently waiving his Miranda rights. On July 29, 1998, the trial court conducted an evidentiary hearing where each party presented expert evidence concerning T.S.D.'s competency to waive his rights.
Dr. Bruce Frumkin, a board-certified forensic psychologist, testified first on behalf of T.S.D. Based upon his interview with T.S.D. and psychological testing,[1] Dr. Frumkin concluded that "it was highly unlikely that, at the time of the police questioning, [T.S.D.] would have been able to make a knowing and intelligent waiver of his Miranda Rights."
During his interview, Dr. Frumkin asked T.S.D. to read the waiver form that he had signed. Dr. Frumkin testified that T.S.D. read at a third grade level, while the Miranda waiver form is written at a sixth or seventh grade level. From the responses, Dr. Frumkin believed that T.S.D. did not understand what the words meant. T.S.D. obtained a verbal IQ score of 67, a performance IQ score of 63, and a full-scale IQ score of 62, which are in the lower-one percentile range compared to other twelve-year-olds. In a similarity sub-test measuring abstract-reasoning skills, which Dr. Frumkin opined was most relevant to Miranda, T.S.D. also scored in the lower-first percentile range.
The "major source" of Dr. Frumkin's opinion that T.S.D. did not comprehend his rights was derived from three specialized tests developed specifically for Miranda based upon the research of Dr. Tom Grisso:[2] the Comprehension of Miranda Rights (CMR), where a person is asked to describe what the rights mean in their own words, the Comprehension of Miranda Rights, True/False, a more non-verbal measure of understanding, and the Function of Rights in Interrogation (FRI), where a subject is presented with hypothetical scenarios involving questioning by police and meeting lawyers, etc.
Dr. Frumkin felt that T.S.D. performed extremely poorly on the CMR test. Dr. Frumkin read T.S.D. the first Miranda right, "You do not have to make a statement *538 and have the right to remain silent." T.S.D. said this meant "I ain't got to say nothing, but I got to remain silent. I can't say nothing." Dr. Frumkin rated this a zero-point response because T.S.D. indicated that he had to be quiet, not that it was his option. Dr. Frumkin read, "If you want a lawyer to be present during questioning at this time or any time hereafter, you are entitled to have a lawyer present," and asked T.S.D. what it meant. T.S.D. said, "It means if I want an attorney to help me with my case, they'll provide one for me." Dr. Frumkin asked, "is that only a certain time when you can have your attorney?" T.S.D. said, "When I go to Court." Based upon this, Dr. Frumkin opined that T.S.D. did not understand the right to counsel before and during police questioning.
Dr. Frumkin administered the CMR True/False test, and T.S.D. obtained a score of eight, scoring poorly on rights two and three, what you say can be used against you in court and having an attorney present at the time of police questioning. The first segment of the FRI questions are designed to measure the understanding of the adversarial nature of the interrogation process, and T.S.D. got full credit on those. The next series of FRI questions are designed to look at an intelligent use of the right to counsel. The question which Dr. Frumkin felt was most significant related to why a boy would tell his lawyer the truth about what happened. T.S.D. answered, "Because he's the attorney. He's supposed to know so he can write up a report for the police" and "to the Judge." Based on that response, Dr. Frumkin felt that T.S.D. was not able to make an intelligent use of the right to counsel, and therefore could not make an intelligent waiver of his rights. When asked if a boy decides not to talk, what is the most important thing the police are supposed to do, T.S.D. was given partial credit for responding, "Take him into custody. See if there's a witness. Investigate the crime." When asked what to do if the police say a boy has to talk, T.S.D. responded, "He got to. No, he got to remain silent." Dr. Frumkin asked him to explain, and T.S.D. said, "You got to talk to the police. If you don't talk to the police, the police will say he got to remain silent." Dr. Frumkin asked T.S.D. what will happen at the hearing when the judge is told that a boy would not talk to the police. T.S.D. responded that the judge will ask what happened and if the boy still says nothing he'll get detained. The last question was whether you have to talk about what you did wrong in court, and T.S.D. responded yes and explained that this was for the boy to defend himself and let the judge know he didn't do it. Dr. Frumkin testified that T.S.D. did not understand all four of the rights and was not able to make an intelligent use of the rights to counsel or silence.
Dr. Frumkin did not assign any weight to the fact that T.S.D. signed the waiver form, explaining that a child might not really understand the Miranda rights but might be too scared or embarrassed to say so.[3] Dr. Frumkin testified that Grisso's research concluded that children do not understand Miranda rights any better as a correlation with multiple contacts with the criminal justice system, analogizing this situation to a person who does not understand Greek reading a passage in Greek several times and not understanding it any better. Dr. Frumkin believed that T.S.D. had four or more contacts with the police prior to this case, which could affect his stress level and therefore his performance. Dr. Frumkin concluded, with a high degree of psychological certainty, that T.S.D. did not fully understand his Miranda rights at the time of the police questioning.
*539 Dr. Leonard Haber testified on behalf of the state. Dr. Haber had previously evaluated T.S.D. for an hour in July 1996 regarding his competency to proceed to trial on separate charges. At that time, Dr. Haber had opined that T.S.D. was below average educationally and concluded that he was incompetent to proceed. In June 1998, Dr. Haber evaluated T.S.D. to assess his competency to waive Miranda in this case. Dr. Haber felt that T.S.D. had matured significantly during the two years and that T.S.D. was significantly easier to understand.
T.S.D. knew who he was, where he was, who Dr. Haber was and understood that Dr. Haber was making a report based upon his answers. T.S.D. was asked what he was charged with and responded that it was grand theft auto and understood that it was a felony, which Dr. Haber testified reflected a good understanding. When asked about possible range and nature of the possible penalties, T.S.D. first said he did not know, then said a possibility was that he could do a program, and when asked what kind of program, he responded it could be a level six or a level eight.[4] When asked to explain, T.S.D. said that the lower was four to six months, and the eight was six to nine months. This reflected that while T.S.D. might not have the best verbal fluency, he certainly had knowledge appropriate to the question.
Dr. Haber next questioned T.S.D. about his understanding of the adversary nature of the legal process. When asked what a jury does, T.S.D. did not know, but Dr. Haber noted that there are no juries in juvenile court. When asked what happens at trial, T.S.D. stated, "I plead guilty or not guilty." When asked what the function of the judge is, T.S.D. reported, "The Judge will release me or detain me." When asked what the prosecutor would do, he responded "Try to pick up my charges" and then later explained that meant, "See that I'm found guilty." T.S.D. next replied that "The Public Defender defends my case." Dr. Haber rated T.S.D. as marginally acceptable in his capacity to testify relevantly, because he is still child-like, has below-average language skills and a limited attention span. Dr. Haber testified that this line of questioning showed that T.S.D. was competent to proceed to trial.
The next phase of Dr. Haber's examination involved a direct Miranda evaluation. Dr. Haber had T.S.D. read every line of the Miranda warning and found him to be able to read quickly on his own with reasonable accuracy, but with some errors and pronunciation problems. Dr. Haber concluded that T.S.D.'s reading was adequate. Next he reviewed T.S.D.'s comprehension, by reading each sentence of the waiver form and asking T.S.D. to explain it's meaning. When he read right number one about the right to remain silent, T.S.D. said, "I do not got to talk to officers if I do not wish to." When asked what "silent" means, T.S.D. said, "Do not say nothing, not a peep. Be quiet. Shut your mouth."
Dr. Haber proceeded to read right number two: "Should you talk to me, anything you might say may be introduced into evidence in Court against you. Do you understand?" T.S.D. responded, "If I talk to him and say I did the crime, whatever I say, it will be against me. If I say I did not do it, it will be against me." When asked what "evidence" means, T.S.D. replied, "Like fingerprints, objects, footprints." He explained the word "introduced" as, "Like they will let you see the evidence."
When Dr. Haber read right number three: "If you want a lawyer to be present during questioning at this time or any time thereafter, you are entitled to have a lawyer present," T.S.D. responded, "Like if I got nobody to defend my case and got *540 nobody to defend my case, they would give me a lawyer present." When asked, "When would they give you a lawyer present?" T.S.D. replied, "When I'm in Court." When asked what "entitled" meant, T.S.D. said, "I could have a lawyer present. I could have a lawyer if I want one." Dr. Haber opined that T.S.D. understood right number three, although he stated that the time factor was an issue. Dr. Haber explained that T.S.D.'s response did not indicate that he knew that an attorney could be brought in immediately, which made the extent of his understanding unclear. Dr. Haber opined that in the totality of T.S.D.'s evaluation, T.S.D. was competent to waive Miranda, even if he responded questionably or incorrectly on one thing.
The next right Dr. Haber reviewed with T.S.D. was "If you cannot afford to pay for a lawyer, one will be provided for you at no cost if you want one." T.S.D. responded, "If I ain't got enough money to pay for a lawyer, then they will give me one free, without paying." When asked, "Who pays for it?" T.S.D. replied, "Nobody. They're going to give it to me free, not no cost." T.S.D. stated that "afford" was "Like ain't got enough money to pay for it" and that "provided" meant "They will give you one." Dr. Haber then read, "Knowing these rights, are you willing to answer my questions without having a lawyer present?" T.S.D. responded, "If I know what they are saying, would I talk to him."
Dr. Haber read the concluding statement, "This statement is signed of my own free will, without any threats or promises having been made to me." T.S.D. responded, "I signed it without nobody threatening me." Dr. Haber opined that T.S.D. understood all of these sentences and rights within a reasonable degree of psychological certainty.[5]
Dr. Haber did not conduct an IQ test, which he felt was relevant but unnecessary where a person is direct, responsive, cogent, intelligent and intelligible in a back-and-forth conversation.[6] Dr. Haber believed that an individual's past experience with the system could affect his ability to competently waive Miranda, due to practice and exposure. Dr. Haber testified that, in his opinion, T.S.D. understood that he could refuse to answer any of the police officers' questions. Overall, Dr. Haber concluded that T.S.D. did knowingly, intelligently and willingly waive Miranda, based upon his own examination and his review of the examination of Dr. Frumkin. This included the questions and answers that Dr. Frumkin testified about, which Dr. Haber evaluated somewhat differently than Dr. Frumkin.
Dr. Haber felt that the difficulty with relying upon the Grisso test was that it had a capacity to be misleading. Dr. Haber reviewed T.S.D.'s responses and found them to be basically acceptable, even though technically they had been scored wrong, because there was some sense underlying those responses. Dr. Haber testified that his evaluation took approximately one hour. He opined that an interview of four hours would have an effect on a child's ability to respond properly, because this could deplete the person's energy or ability to concentrate, particularly where the Miranda tests, as here, come last after a series of other tests.
The court heard argument of counsel. Defense counsel asserted that the key issue in the case was whether T.S.D. knew that he was entitled to a lawyer when they were asking him questions at the police station. The trial court responded that *541 T.S.D. knew that he could not be questioned if he did not want to be questioned without a lawyer. Defense counsel disagreed, asserting that T.S.D. indicated to Dr. Frumkin that if he did not talk, the judge could hold it against him. The court stated, "On the contrary, it was Dr. Frumkin who suggested that to [T.S.D.], and it was my concern that that question was misleading." Defense counsel argued that research was contrary to Dr. Haber's conclusion concerning understanding Miranda better with more contact with the system. The court responded:
I had a lot of trouble with Dr. Frumkin's analogy with reading Greek, and I think Dr. Haber had a lot of problem with that. And yes, I can sit down and read Greek all day long and read it ten times over and it's not going to give me a hint as to what I'm reading. But I think you go through the system enough times, you get appointed a lawyer enough times, and I think that you begin to learn what those rights mean.
The judge questioned whether based on the testimony about T.S.D.'s abilities, whether a four hour test would be fair under any circumstance, and based this upon his own life experience about how grueling and exhausting any four-hour test is. Defense counsel argued that Dr. Haber made no effort to ascertain whether T.S.D. was actually absorbing and understanding the information, and the court responded that T.S.D.'s own words were that silence meant "not say a peep."
The state argued, and the defense agreed, that the court must look to the totality of the circumstances. The state asserted that while age and IQ can be considered, those factors alone cannot rule out all remaining statements. The state argued that the Grisso tests were conducted circa 1970 and that exposure to Miranda was different today. The court stated that it had a lot of trouble with the Grisso test, in particular the scoring. The court noted that some of T.S.D.'s answers for which Dr. Frumkin gave no credit seemed to the court to be fairly appropriate and astute answers. The court was very troubled with that test and the heavy reliance that Dr. Frumkin placed on it, after many hours of other testing.
At the conclusion of the hearing the trial court denied the motion, finding as follows:
I find that [T.S.D.] was competent to waive his Miranda rights. I believe he had the ability to understand each of those rights and to knowingly and intelligently waive each of those rights.
I think that Dr. Haber's approach to examining that more clearly showed [T.S.D.'s] understanding of Miranda than Dr. Frumkin's approach. Whether the test is nationally recognized or not, I found some of the questions somewhat puzzling, particularly when presented verbally to a child of twelve.
Two days later, the trial court conducted a colloquy before accepting the T.S.D.'s no contest plea. During this hearing, the trial court stated:
I want to clarify my ruling in this case for purposes of assisting both sides to properly raise the issues as they were framed before me.
I denied Defense's motion which was presented as a motion to determine competency for Miranda, but is in fact what I consider to be a motion to suppress grounded on the allegation that the Respondent is incompetent to waive Miranda.
It is my ruling and I find that the Respondent is competent to waive Miranda. There was no evidence presented at the hearing regarding the actual presentation of or waiver of the rights in this case. Therefore, the Court is unable to make any determination whatsoever as to whether, on the date in question, the Miranda rights were in fact intelligently and voluntarily waived.
I find only, based on the representation of the Public Defender prior to the hearing, that it was a hearing merely to determine the competence, that is the *542 capacity, of your client to understand and voluntarily waive his rights. That was the extent of the hearing, and I find that your client did have the capacity to understand, appreciate and waive the Miranda rights.
While I agree with the Defense that the Respondent may not have answered one of Dr. Haber's questions perfectly, I agree with Dr. Haber that viewing the totality of the Respondent's answers, that it is apparent that he does have the capacity to understand and voluntarily waive his rights.

ANALYSIS
The panel's decision, as suggested above, constitutes nothing less than a reweighing of the evidence and the reaching of a conclusion different than that reached by the trial judge. The standard of review does not allow for such a re-weighing of the evidence.
The panel opinion emphasizes four factors, the respondent's age of twelve years, his history of psychological problems,[7] his IQ of 62 and the fact that he reads at a third grade level whereas the Miranda rights are written at a sixth or seventh grade level. It is clear that a respondent's age, standing alone, is not sufficient to conclude that he was unable to understand his rights, see W.M. v. State, 585 So.2d 979 (Fla. 4th DCA 1991), the panel acknowledges as much. Accordingly, one must look to the other factors which might, in conjunction with the respondent's age, lead to the conclusion that the trial judge's conclusion was clearly erroneous.
The defense expert, Dr. Frumkin, concluded that the respondent's IQ is 62. In evaluating the significance and weight to be given the result of this test it is important to remember that the test is not being given in an academic environment where the respondent is motivated to excel. Thus, although T.S.D. could not possibly achieve a score greater than his true abilities allow, it is entirely possible that the result achieved represents something less than his best effort. It would be naive to presume that the child's attorney would not have explained the nature of the testing to be conducted and the intended use of those results. The same holds true of the child's reading skills. The testimony that the child reads at a third grade level was offered by Dr. Frumkin and the assessment was based upon tests conducted for purposes of this litigation. Although this type of testing is certainly admissible for the purpose for which it was offered, its nature is certainly a factor which the fact-finder can consider in determining the weight it should be afforded. The record is clear that the trial judge did just that.
Dr. Haber, also a qualified forensic psychologist, interviewed the respondent and opined that the respondent was competent to waive Miranda. Although the respondent did not "express the ability to fathom the concept that he was entitled, by virtue of the rights read to him, to have an attorney present with him at the time he was being questioned," during his interviews with the psychologists, T.S.D., 741 So.2d at 1142, 24 Fla. L. Weekly at D1149, Dr. Haber opined that, given the totality of his responses, the respondent was competent to waive his rights. The trial judge believed him; the panel did not. In Gilbert v. State, 629 So.2d 957, 958 (Fla. 3d DCA 1993), this Court said that: "[T]he ruling of a trial court on a motion to suppress, comes to the reviewing court clothed with a presumption of correctness, and the reviewing court must interpret the evidence and reasonable inferences and deductions derived therefrom in a manner most favorable to sustain the trial court's *543 ruling." See also State v. Butler, 520 So.2d 325, 326-27 (Fla. 3d DCA 1988); State v. Rizo, 463 So.2d 1165, 1167 (Fla. 3d DCA 1984); Finney v. State, 420 So.2d 639, 642 (Fla. 3d DCA 1982); Barrios v. State, 397 So.2d 440, 441 (Fla. 3d DCA 1981).
Given the facts of this case, the reasonable inferences which can be drawn therefrom and the conflicting evidence provided by the expert witnesses, I do not believe this court can legitimately conclude that the trial judge's decision was clearly erroneous. I would grant rehearing en banc and affirm.
JORGENSON and COPE, JJ., concur.
NOTES
[*] SCHWARTZ, C.J., and LEVY, J., are recused.
[1] T.S.D. was given the Wechsler Intelligence Scale for Children, reading and spelling sub-tests of the Wide Range Achievement Test, the Bender Visual-Motor Gestalt, the Rorschach inkblot, two tests to evaluate possible malingering or cognitive deficits (the word recognition test and the Ray Memory Test) and a Test of Nonverbal Intelligence. These tests were administered by an assistant before Dr. Frumkin "scored" and interpreted the results.
[2] Dr. Frumkin testified that the Grisso tests were conducted in the 1970s, where a national panel of judges and lawyers analyzed and rated the different types of responses from both adults and children about the meaning of the Miranda rights. He further testified that the Grisso tests are highly regarded by people who do Miranda rights evaluations.
[3] Dr. Frumkin did not specifically ask T.S.D. whether he understood, because he needed to objectively measure T.S.D.'s understanding.
[4] Upon adjudication of delinquency, juveniles can be committed to varying levels of detention, including moderate-risk residential placement (level 6) and high-risk residential placement (level 8). See § 985.03(45), Fla. Stat. (1997); J.E. v. State, 676 So.2d 39, 40 (Fla. 3d DCA 1996).
[5] I note that this conclusion is diametrically contrary to Dr. Frumkin's opinion that T.S.D. did not understand any of the rights, thus creating the quintessential credibility issue, the resolution of which is the exclusive province of the fact finder.
[6] Dr. Haber also testified that it is not appropriate to repeat an IQ test within a time frame of less than six months. Dr. Frumkin's evaluation was on May 19th; Dr. Haber's was in July.
[7] As best I can tell, the respondent's "history of psychological problems" began in 1996 when the respondent was ten years old, the time of his first arrest. In 1996, Dr. Haber found him to be incompetent to stand trial. It is unclear from this record whether the diagnosis at that time involved a mental illness, or whether the respondent's incompetence was due to his extremely young age.